[No. S059531. Apr. 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN MORELAND REDD, Defendant and Appellant.

**COUNSEL**

Grace Lidia Suarez, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—A jury convicted Stephen Moreland Redd of the first degree murder of Timothy McVeigh (Pen. Code, §§ 187, subd. (a), 189), the attempted murders of James Shahbakhti and Chris Weidmann (Pen. Code, §§ 187, subd. (a), 664), two counts of second degree robbery (Pen. Code, § 211), and two counts of second degree commercial burglary (Pen. Code, § 459).[1] The jury found true the special circumstances that the murder was committed while defendant was engaged in the commission of robbery and of burglary. (§ 190.2, subd. (a)(17)(A), (G).) The jury also found true the allegations that defendant personally used a firearm in the commission of each of the seven crimes (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)), and that defendant, with the specific intent to inflict such injury, personally inflicted great bodily injury upon James Shahbakhti (§ 12022.7). The jury also found that defendant previously had been convicted of five serious or violent felonies. (§ 667.) Following the penalty phase of the trial, the jury returned a verdict of death. Defendant moved for a new trial (§ 1181) and for modification of the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)). The trial court denied these motions and sentenced defendant to death. The court also sentenced defendant to a term of 111 years to life in prison with respect to the other charges of which he was convicted, and ordered restitution in the amount of $10,000. (§ 1202.4, subd. (b).) This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment in its entirety.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I. FACTS

A. *Guilt phase evidence*

1. *The prosecution case*

a. *Burglary and robbery at Sav-on drugstore*

On March 13, 1994, Dean Bugbee was working as a supervisor at a Sav-on drugstore in the City of Orange. Bugbee testified that he was counting currency in the store's safe at approximately 10:50 p.m. when defendant approached the safe, stated "it's time for a till audit," and held a gun over the door of the safe. Bugbee stood up and faced defendant, with a distance of approximately two feet between them. According to Bugbee, defendant removed between $2,000 and $3,000 from the safe, placed it in his pocket, and exited from the store.

Bugbee confirmed that he described defendant to law enforcement officials as a White male, 32 to 38 years of age, approximately five feet eight inches tall, and approximately 210 pounds in weight, with dark brown hair. Bugbee recalled that defendant was wearing sunglasses, light blue jeans, a dark blue zip-up sweat jacket with a hood, and a baseball cap. The hood was over defendant's head when he entered the store, and Bugbee could not discern whether the hair he saw was natural or a wig. He confirmed at trial that defendant's weapon had a chrome surface, and that he described it at the time of the events as possibly a .45 semiautomatic pistol.

On June 16, 1994, Bugbee met with representatives of the Orange Police Department, who showed him photographs of six individuals. Bugbee confirmed he told the police that "number three looks the closest by the shape of his face. If he was to put dark glasses on I would say it was him." He acknowledged that, unlike the person who robbed him, the individual in the third photograph had a beard and mustache, but confirmed that he "felt this was the person."[2]

b. *Attempted murders outside Vons market*

On May 31, 1994, James Shahbakhti was working as a uniformed but unarmed officer for a private security company. He testified that at approximately 10:40 p.m., his dispatcher requested that he respond to a report of a

---

[2] Michael Harper, a detective with the Orange Police Department, testified that he assembled a photographic lineup, and that the individual in the third photograph was defendant. He explained that although witnesses had described the suspect as clean shaven, defendant had facial hair in the only photograph of him available. Therefore, Harper had selected photographs of other individuals who had facial hair, in order to present witnesses with an array of individuals who were similar in appearance.

transient harassing customers at a Vons market in the City of Orange. When he arrived at the shopping center in which Vons was located, a person who appeared to be a transient attracted his attention. The individual was approximately 70 or 80 yards from Vons, near a karate studio situated to the right of Vons and the Sav-on drugstore. Shahbakhti testified that he drove his marked security vehicle past the individual and circled around, to give himself an opportunity to observe the individual and to request the assistance of another private security officer. He then left his vehicle and approached the individual, who, at this point in time, was in the front of the Vons market. Shahbakhti testified that he asked the man what he was doing there and, when the man did not respond, asked him for identification. The man replied that he did not have any identification, and that he would leave the area. Shahbakhti then asked the man to remain where he was.

Chris Weidmann, who was Shahbakhti's backup private security officer and also unarmed, arrived at the scene in a marked patrol vehicle. Shahbakhti testified that as Weidmann exited from his vehicle, the man removed a gun from his jacket pocket and pointed it at Shahbakhti's face. Shahbakhti estimated that he and the man were standing two to three feet apart, and he testified that he could see the man's face clearly. Shahbakhti next recalled seeing Weidmann running toward Shahbakhti's vehicle, and then seeing the man fire one or two shots at the vehicle, from which Weidmann was attempting to retrieve a cellular telephone. Shahbakhti further testified that as the man fired at Weidmann, Shahbakhti began running away from the man. As he ran, he heard three to five more shots and was struck in the back. Shahbakhti also testified that the bullet entered his shoulder muscle, hit a bone, tore cartilage, collapsed one of his lungs, and hit his clavicle.

The next day, Shahbakhti was interviewed by Detective Michael Harper of the Orange Police Department, who showed him the same photographic lineup viewed by Bugbee. (See, *ante*, fn. 2.) Shahbakhti testified that one of the six photographs "looked just pretty much like who the individual was." He confirmed that he told Harper "I can't be one hundred percent, but I'd say number three," and he was "90 to 95 percent sure" that the third photograph was of the man he encountered at the Vons market. Shahbakhti also confirmed that the man wore a dark blue hooded sweatshirt with a front zipper, a black or navy blue watch cap, blue jeans, and what appeared to be a woman's dark-colored shoulder-length wig. Finally, he testified that the man's weapon was a chrome semiautomatic handgun.

Chris Weidmann testified that as he approached Shahbakhti and the man with whom Shahbakhti was speaking, he heard the man state that he was leaving, and Shahbakhti telling the man that he needed some information from him. Weidmann walked around a large pillar in front of the Vons market

as he approached them, and encountered the man as the man walked around the pillar. Weidmann could not see Shahbakhti, who was behind the pillar, and did not see the man's gun until the man pointed it at Weidmann's forehead. Weidmann recounted that he raised his hands and said to the man, "you're the boss," and the man then lowered his gun and turned back toward Shahbakhti. Weidmann testified that he then ran to Shahbakhti's vehicle, because it had a cellular telephone inside. After Weidmann entered 911 and pressed the "send" button, he looked up and saw the man standing by the passenger side of the vehicle, pointing his gun at Weidmann's head. Weidmann testified that the man rapidly fired three shots, all of which struck the vehicle occupied by Weidmann. Weidmann explained that when he felt broken glass from the windshield strike his face, he grabbed his face to make it appear that he had been hit by gunfire, rolled out of the vehicle, and pretended to be dead. He testified that he heard four additional shots from the same gun but, until the man fled, he was unaware Shahbakhti had been shot.

Weidmann testified that he was unable to identify in photographs the man who shot at him, but confirmed that the man was wearing a woman's brown shoulder-length wig and a blue or purple hooded sweatshirt. He described the man's gun as a chrome nickel-plated automatic weapon that he thought to be a nine-millimeter firearm.

Joseph Loya testified that on May 31, 1994, at 10:45 p.m., he was parking his vehicle approximately 100 yards from the back parking lot of the Vons market when he saw a man wearing dark clothing and a zippered sweatshirt with a hood jog out of an alley. The man stopped next to what appeared to Loya to be a light blue 1984 Ford Tempo. Loya testified that the man removed a mask, or perhaps a hat and a wig, exposing a white face and clean-shaven head. The man then entered the light-blue vehicle and departed, driving in a normal manner. Loya followed the man's vehicle in his own vehicle, and recorded the vehicle's license plate number. Loya followed the vehicle for approximately three minutes, during which time the man began speeding and driving erratically, and then Loya contacted the Orange Police Department and reported what he had witnessed.

Detective Harper testified that the vehicle with the license plate number provided by Loya was a blue Mercury Topaz, which is "basically the same model" as a Ford Tempo, and that the vehicle was registered to defendant. Harper testified that he requested the Fullerton Police Department to look for defendant at an apartment complex in the City of Fullerton.

Linda King, a police officer with the City of Fullerton, testified that at approximately 1:00 a.m. on June 1, 1994, she received a request to travel to an address on Deer Park Avenue in the City of Fullerton with the objective of

locating defendant's vehicle. She recalled that as she was driving on Deer Park Avenue, she saw a white male exit from a driveway, cross behind her patrol unit, and walk into the apartment complex across the street. She made eye contact with the individual and kept driving. After approximately five minutes, she saw in a carport a vehicle bearing the license plate number she had been provided. Thereafter, she was shown a photograph of defendant, and recognized him as the person who had crossed the street as she drove on Deer Park Avenue.

King testified that police officers then approached defendant's apartment and observed that the door was open, all the lights were on, and defendant was not present. Thereafter, Detective Harper searched defendant's apartment. Harper testified that he collected various items, including a brown wig and two live rounds of ammunition for a .380-caliber pistol. He confirmed that a .380-caliber weapon had been used to shoot Shahbakhti, and that the ammunition found in defendant's apartment was of the same type and brand as was found at the Vons market. Harper explained that he also was investigating the robbery of Dean Bugbee, and collected evidence that he thought might be related to that crime, including a blue baseball-type cap. He also found two empty boxes, each of which previously had held a laser sight designed to be attached to a firearm, and receipts for two magazines for a .380-caliber handgun. Finally, in the blue Mercury Topaz that King located in a carport at the apartment complex, Harper found a watch cap and a bill of sale for the vehicle, listing defendant as the purchaser.

c. *Burglary, robbery, and murder at Alpha Beta market*

Brenda Rambo testified that she was working at a cash register in an Alpha Beta market on July 18, 1994, at approximately 10:40 p.m., when she observed a man enter the store wearing a woman's wig. The only other employee on duty at that time was Rambo's supervisor, Timothy McVeigh. Rambo testified that the man looked at her, walked around behind her checkout stand, and then came into her checkout aisle and set down a pack of gum. She related that "[a]fter I rang it up he threw down a dollar and told me that I'd have to break it." She turned to put the dollar in the cash register, and "[t]he next thing I know I had a gun at me." According to Rambo, the man did not say anything, but reached across the conveyor belt, removed a tray of money from the cash register's drawer, and set it on the belt. He began removing money with his left hand, as he held the handgun in his right hand. Rambo testified that the robber did not appear to be nervous.

Rambo testified that during the time defendant was removing money from the cash tray, she said "Tim." She recalled that several seconds passed, and then McVeigh appeared at her checkout stand. She related that McVeigh

grabbed the man's left wrist and placed his other hand around the man's shoulder. The man turned toward McVeigh, and the two men struggled for a short period of time. Rambo then heard the gun discharge. The two men let go of each other, and McVeigh stepped back and fell a few feet away from where the struggle occurred. Rambo recalled that the man again pointed the gun at her, and she knelt down and "asked him please don't." She described the man as "calm" after McVeigh was shot, and testified that he turned and left the store with the money he had removed from the tray.

Rambo testified that the robber wore a wig, a baseball hat, clear-framed dark plastic glasses, a purple-pinkish long-sleeved shirt, and jeans. She confirmed that on July 21, 1994, she was asked by Detective Brakebill of the City of Brea Police Department to review a photographic lineup of six individuals. She selected the second photograph, which is identical to the photograph of defendant that appeared in the third position in the lineups shown to Bugbee and Shahbakhti. Rambo testified that the person in the second photograph "appeared to be similar, very similar to the person" who robbed her. She confirmed that the only significant differences between the person in the photograph she chose and the person who robbed her was that the latter did not have a beard or mustache.

Kelly Carpenter, a City of Brea police officer, testified that he received a request for emergency assistance at approximately 10:40 p.m. on July 18, 1994. When he arrived at the Alpha Beta market four minutes later, he saw a man lying on the floor and Brenda Rambo standing beside the man, screaming and crying. At trial, he reviewed his police report setting forth Rambo's description of the events on the evening of the incident, which was substantially similar to Rambo's testimony at trial. Carpenter also testified concerning the crime scene, including the open cash drawer, the money tray and gum on the conveyor belt, a shell casing in the aisle from a .380-caliber semiautomatic handgun, and a pair of glasses Carpenter found in the store parking lot.

Paul Diersing testified that he was the manager of the Alpha Beta market where McVeigh was shot. He conducted an inventory after the incident, and determined that $156 was missing.

Richard Fukumoto, the pathologist who conducted the autopsy upon McVeigh, testified that the cause of death was acute hemorrhaging that resulted from a gunshot wound through the victim's abdominal aorta and stomach. According to Fukumoto, the entry wound reflected that the firearm was discharged within three inches of the victim. He further explained that the bullet entered the front of the victim's body, traveled from the victim's left to right side, front to back, and downward, and was recovered from the victim's right back side. He confirmed that the wound was consistent with

testimony indicating that two men were grappling and a gun discharged in close proximity to the victim.

### d. *The apprehension of defendant and search of his vehicle*

Robert Jansing, a police officer with the United States Park Police in San Francisco, testified concerning his arrest of defendant on March 6, 1995. He explained that he noticed the registration tag was affixed poorly to the license plate of a vehicle in which defendant was seated, and he asked his dispatcher to investigate whether the vehicle was registered. When Jansing learned that the vehicle's registration had expired, he requested that defendant produce his vehicle registration and driver's license. After defendant failed to produce either, Jansing asked defendant to step out of the vehicle, which he did, and Jansing placed him in handcuffs. Pursuant to the arrest, Jansing searched defendant and found defendant's driver's license. Jansing informed his dispatcher that the individual's name was Stephen Redd, and learned that defendant was wanted for murder and robbery in Orange County. Jansing testified that he received permission from his supervisors to impound the vehicle, and he then conducted an inventory search. Among the items he found in the trunk of the vehicle were a .380-caliber semiautomatic pistol with a laser sight attached, an AR-15 rifle with a laser sight attached, and wigs.[3]

Dennis Fuller, a forensic scientist with the Orange County Sheriff's Department's crime laboratory, testified that he analyzed the six bullet casings and the two bullets recovered from the scene of the Vons market assaults, the bullet casing recovered from the Alpha Beta market, and the bullet recovered from Timothy McVeigh's body. His analysis led him to conclude that all of the bullets and casings were fired from the .380-caliber semiautomatic handgun recovered during the arrest of defendant. Fuller also testified that his testing established the weapon operated properly, would not fire when the external safety mechanism was placed in the position to prevent the weapon from firing, would not fire without someone pulling on the trigger, and did not have a "hair trigger."

Jerry Brakebill, an officer with the City of Brea Police Department, was the primary detective assigned to investigate the murder of Timothy McVeigh. He testified concerning the items found in defendant's vehicle at the time of the arrest. These items included: two magazines for .380-caliber ammunition; .380-caliber ammunition; two sights that matched the empty sight boxes found in defendant's apartment and that were attached, respectively, to a

---

[3] Jansing's interactions with defendant are described more fully below, in connection with defendant's claim that the evidence seized by Jansing should have been suppressed.

.380-caliber weapon and an AR-15 firearm; a blue "beanie" cap; a baseball cap; a purple hooded sweater with a zipper; sunglasses, and women's wigs, two brown and one blond.[4]

### 2. *The defense case*

Defendant presented no evidence at the guilt phase.

### B. *Penalty phase evidence*

### 1. *The prosecution case in aggravation*

The prosecution presented testimony concerning five armed robberies committed by defendant in 1982. Gay Swanberg testified that defendant robbed her on September 30, 1982, as she worked as a cashier at an Akron store in the City of Orange, and that he "seemed very calm, matter of fact." Dennis Misko and Laura Meraz testified that defendant robbed them on October 2, 1982, as they worked at a Federated store in Santa Ana. Gilbert Quihuiz testified that defendant robbed him and other bank tellers on October 6, 1982, at a Bank of America branch in Santa Ana. According to Quihuiz, as defendant was leaving, he said, "No one should follow me out the door, I shoot people," "My landlord is going to love me," and "You all have a nice day because I'm going to have a great one." Gary Stewart testified that defendant robbed him and other bank tellers on October 27, 1982, at Southern California Bank in the City of Orange. According to Stewart, before defendant left he said: "Unemployment is great. I used to be poor. Now I'm rich. I do this all the time." As he left, he said "Have a good day." Everett Caldwell, a customer who was inside the Southern California Bank during the robbery, testified that defendant was "a very calm person," seemed "jovial," and appeared to be having a good time. According to Caldwell, defendant told the persons in the bank to wait ten minutes before leaving or he would

---

[4] Although apparently unconnected to the charged crimes, numerous other items found in defendant's vehicle also were identified by Brakebill at trial, including a bulletproof helmet, bulletproof body armor, smoke grenades, an M203 grenade launcher that attaches to an AR-15 firearm, ammunition and clips for an AR-15 firearm, a stun gun, an inoperable "homemade" Sturm, Ruger-type firearm, and parts of other types of weapons. The jury was admonished with respect to the items found in defendant's vehicle: "The only items which you may consider are those which are relevant to the crimes alleged in the information. Namely, any clothing which may relate to that worn by the perpetrator of any of the charged crimes, such as hats, wigs, or glasses, which may have been used by the perpetrator of any of the charged crimes, a .380 semiautomatic handgun with laser sights, and any .380 ammunition which may have been used by the perpetrator of any charged crime. [¶] You are hereby instructed that you are not to consider any other items seized from the vehicle in San Francisco in any fashion. [¶] You must not discuss any of those items or allow them to enter into your deliberations in any way. Those items are not relevant to your determination of the issues presented in this case."

"blow them away." Finally, Michael Canzoneri, Sharon Snowden, and Jacquelyn Coffery testified that defendant robbed them on November 10, 1982, as they worked as tellers at the East La Habra branch of Security Pacific Bank. Canzoneri recalled that defendant was "extremely calm" until Snowden informed him that she was not open and that he should go to another window. Snowden testified that defendant pounded on her counter, demanded that she come to her window, and told her, "You bank tellers are an endangered species." She also recalled that when defendant left, he said, "Have a nice day." Coffery testified that defendant pushed a customer aside to get to Coffery's window, made threatening remarks, and did not seem nervous.

Six police officers testified concerning their pursuit and apprehension of defendant as he fled Security Pacific Bank on November 10, 1982. Officer John Reese arrived at the bank in uniform and pursued defendant on foot. Reese testified that defendant stepped out of a bush where he was hiding and fired "a burst of gunfire" in Reese's direction, hitting Reese in the leg. Defendant then ran down a dead-end alley, and a brown vehicle drove out of the alley. Officers John West and Raymond Breuer testified that as they pursued the brown vehicle in their marked police vehicles, defendant fired shots out of the back window of the vehicle. One bullet hit West's windshield, and bullets hit Breuer's headlight frame and a tire. The pursuit continued onto freeways, at speeds in excess of 100 miles per hour. West estimated that 15 to 20 police vehicles were involved in the pursuit, and Breuer estimated that the pursuit continued for 45 to 50 miles, with sporadic gunfire throughout. Officer Jose Talavera testified that when the brown vehicle turned around and came back toward his marked police vehicle on the freeway, defendant made eye contact with Talavera, waved at Talavera, and appeared to be smiling. Officer Mike Cordua testified that he pursued the brown vehicle in a helicopter, fired a single round, and hit the driver's side mirror. After the helicopter circled around, Cordua saw that the vehicle was parked and the driver was holding both of his arms out the window.

Officer John Rees (not the Officer John Reese previously referred to) testified that he searched defendant's vehicle and home after defendant was apprehended on November 10, 1982. Rees found four weapons in the front passenger compartment that were loaded and capable of being fired—an AR-7 Explorer .22-caliber semiautomatic rifle, a Browning high-power nine-millimeter semiautomatic pistol, a Ruger Mini-14, .223-caliber "converted to full automatic" rifle and a .308-caliber rifle. He also found evidence of at least 22 expended casings from a .223-caliber weapon and a nine-millimeter weapon. In defendant's home, Rees found two more firearms—a seven-millimeter mag rifle and a Tager, AP-75, .22-caliber, semiautomatic rifle—as well as abundant amounts of ammunition, including 17 20-round boxes of

.223-caliber ammunition, 96 .22-caliber rounds, 85 nine-millimeter rounds, and 39 seven-millimeter rounds. He also found four wigs.

Peter De Bernardi, a California Highway Patrol officer, testified that he issued a speeding citation to defendant on November 8, 1982. Although defendant had been traveling at a speed in excess of 75 miles per hour, De Bernardi's citation stated that defendant had been traveling 60 miles per hour in a 55-mile-per-hour zone. Approximately seven months later, De Bernardi received a letter from defendant, with a return address of the California Men's Colony in San Luis Obispo. The letter informed De Bernardi that defendant had not shot him because De Bernardi was a "pleasant sort of guy."[5]

Timothy McVeigh's immediate family testified concerning their loss. His sister, Cheryl McVeigh, who was one year younger than the victim, described him as a "great brother" and her "best friend." He enjoyed fishing and building model airplanes. As an adult, he helped Cheryl, who was a single mother, with her three children, and took them on outings. He spoke about having children, and she joked with him that she would spoil his children the way he spoiled hers. She testified that she could speak with him about anything, and missed hugging him and hearing his encouraging words. She described receiving a telephone call informing her that her brother had been shot, and learning from the surgeons that he had died.

The victim's brother, Michael McVeigh, who was four years younger than him, testified that his older brother took him along as a child to his school activities and let him borrow his car for the senior prom. Michael remembered watching his brother caring for Michael's young daughter, and looking forward to the day when Timothy also had a family. Michael testified that his brother cared for his mother and his grandfather, and Michael described the horror of realizing he no longer had a brother.

---

[5] The letter informed De Bernardi that defendant had had automatic and semiautomatic weapons underneath "junk" on his front and back seats. It stated that defendant "had been perpetrating bank robberies with an automatic rifle in Orange County," and was struggling with two personalities at the time of his crimes—a "regular Mr. Nice Guy," and one with a violent nature. "When you pulled me over, my negative side had me reaching for my automatic (sawed off) rifle (with 40 round clip). Fortunately, Mr. Nice Guy dominated & a 'let's play it by ear' truce was in effect. [¶] You were a pleasant sort of guy. The kind of person this planet sees to[o] infrequently. Mr. Nice Guy gave you a pass." In a footnote, he added that, as De Bernardi was writing the citation, "the negative persona was conjuring thoughts of old traffic warrants & notification thereof via radio. Nice Guy persona 'said' in essence 'let the chips fall as they may' & I pushed the automatic rifle under the junk." In a postscript, defendant revealed that he had "engaged numerous departments in gunfire after a bank robbery," and had seriously wounded an officer with the same automatic rifle that he had had his hand on when De Bernardi approached him.

Timothy's father, James McVeigh, a retired police officer, described Timothy as "a good boy," "a fun kid," and "just a nice guy to be around." He stated there is a hole in his heart that will never be filled, and not a day goes by that he does not think of his son.

The victim's mother, Carol McVeigh, testified that she and her son had been close throughout his life. He had a gift of humor and loved to tease. He was active in drama in high school and represented the school at The American Legion California Boys State in Sacramento. They took trips together, and he frequently called and visited her. He loved to read, and "we could talk and share so many different things." He had taken flying lessons in his spare time, and had earned his certification as a jet pilot. He was a hard worker, and she "couldn't ask for a better [son]." On the night he was shot, he had spoken to her on the telephone at 8:00 p.m., but had been called away. When the telephone rang later that evening, she thought it was him calling back, but instead she learned he had been shot. Upon hearing this, she felt as if she had died inside. She stated she wanted to hold him one more time, and regretted she did not have an opportunity to say goodbye to him.

### 2. *The defense case in mitigation*

Defendant's mother, brother, and three children testified concerning their relationships with defendant. His mother, Rosemary Redd, testified that she was a stay-at-home mother, and defendant was her first-born child. The family was "intact" and "close" while defendant was growing up, and defendant had "a regular happy childhood." His grandparents lived nearby and had a close relationship with defendant. Defendant was ambitious and, at 12 years of age, began shining shoes to earn money. He performed well in school and had no significant behavior problems. He graduated from high school in 1963, resided at home while attending junior college, moved out of the family home in 1965 when he married, worked with his father and grandfather in the real estate business, and in 1967 attended the Los Angeles County Sheriff's Department Academy. His mother regularly visited defendant in prison in the 1980's, and had "constant" correspondence with him during his imprisonment. Defendant continued to write to her at the time of the trial proceedings in the present case.

Richard Redd, defendant's brother, testified that he and defendant grew up with their parents and maternal grandparents on an acre of land that contained an orchard and a swimming pool. Their paternal grandparents resided nearby, and the family was close. He recalled that defendant was very popular and had many friends. He also testified that defendant was proud when he became a Los Angeles County Sheriff's deputy, and initially enjoyed his occupation. Thereafter his personality changed, and he became "tougher" and "more

macho," especially after he was assigned to the Firestone Station. He recalled that defendant separated from his wife shortly before or at the same time that he resigned from his employment with the sheriff's department, and that the breakup of his marriage and the termination of his employment "hit [defendant] pretty hard." He testified that after leaving the sheriff's department, defendant worked hard—sometimes 16 hours a day—constructing homes, apparently with an understanding that he would receive a percentage of the profits upon the sale of the homes. According to Richard, defendant could "build everything," but was "not too good" as a businessman and ended up with little at the conclusion of these construction projects. When defendant had no more funds and could not find employment, he resided with their grandmother in Willits and with Richard in Whittier. While residing with Richard, defendant possessed firearms, read "macho" literature, and talked of "going off to war." Richard testified that he was shocked when he saw defendant on the television news after defendant was pursued by police officers through four counties. Richard also testified that after defendant was released from prison, he resided with Richard and sought employment, but defendant was required to inform potential employers that he had been in prison. Richard stated that defendant had saved Richard's life when the family's house had filled with gas, and defendant opened a window, put Richard's head out the window, and pounded on Richard's back. Richard confirmed that he had "very strong personal feelings" for defendant.

Michael Redd, defendant's older son, testified that his parents divorced when he was approximately six years of age. For most of his life, Michael resided with his mother, but for approximately three years, when he was nine to 12 years of age, he resided with defendant. Defendant taught his two sons construction skills as he worked on the family dwelling. He also taught them to ski and surf, and they played chess and had pillow fights. At 12 years of age, Michael moved with his mother to Willits. Michael testified that defendant visited the family in Willits and resided and worked for a time in that community, but that employment "was pretty scarce." Michael maintained some contact with defendant when defendant went to prison in 1983, but had seen him on only three occasions during the 15 years that preceded the trial in the present case. When asked to describe the value of his relationship with defendant, Michael testified that defendant "taught me how to work. I wouldn't be in charge of a [grocery store's night] crew if it wasn't for [defendant]." He added that "if we ever needed [defendant], he would be there" and "wanted to do good for us," and that defendant "did his best to do what he could." He confirmed that he loved defendant very much.

Sean Redd, defendant's younger son, testified that he learned his work ethic from defendant, and that there was "a lot of love in our family." He recalled the three years during which he and his brother resided with defendant, and helped work on a house, as a time when "money was tight"

but defendant "did everything he could for us." Defendant visited and wrote to the family when they were in Willits, and continued to write occasionally. Sean, who had been in the military for 10 years at the time of the trial in 1996, estimated that he had seen defendant on four or five occasions since 1980. He stated that his relationship with defendant has value, that he loves defendant very much, and "it's just hard on the family."

Melissa Redd, defendant's daughter, testified that she resided with defendant for approximately two weeks during her childhood. She recalled that he let her help build his house and took the children to the movies and to the beach. He was nice to her and would not let her brothers pick on her. She recalled that he resided in Willits for a time with her grandmother, but was unable to find work in that community. She stated she had not seen defendant frequently during the preceding 14 years, but he wrote letters to her and drew pictures for her children. She stated she still loved defendant, and "what I did know of him, he was a positive figure in my life."

Two witnesses testified concerning defendant's activities between the time of McVeigh's murder and defendant's arrest. Eugene Lin testified that he met defendant when defendant was picking up cans and bottles from the trash by Lin's hotel. Lin offered defendant (who identified himself by his true name) employment performing maintenance on the hotel. Defendant resided in Lin's hotel and worked for Lin from September 17 to October 3, 1994. Defendant left suddenly, without collecting $80 that was due him. On May 9, 1995, Lin received a letter from defendant, asking that Lin send the money to defendant's mother. Richard Lum, who worked at a recycling center in San Francisco, recalled that during a period of eight months or longer, in late 1994 and early 1995, defendant redeemed cans and bottles at the center at least twice a week. Lum testified that defendant used the name "Redd."

Three former deputies with the Los Angeles County Sheriff's Department testified concerning their experiences working with defendant in the department. Allen Campbell and defendant served together for most of the three years that Campbell was assigned to the Firestone Station, and subsequently for a year or longer at the West Hollywood Station. Campbell described the area served by the Firestone Station as a "war zone," and stated that four deputies were killed there in a period of two or three years. He testified that the violence he encountered as a sheriff's deputy affected his marriage and affected him physically, and that he retired on disability in 1980.

Wiley Newman also worked at the Firestone Station, which he described as a "combat zone." He testified that he was shot while assigned to that location, and did not receive counseling. He and defendant were partners for approximately one week while they served at Firestone. During that week, they responded to a fire at a residence. Newman ran into the burning home to save

an occupant, despite being told by the fire department that it was too hot to enter. Defendant remained outside. They both received Medals of Valor for saving the occupant.

Thomas Grant testified that he was employed with defendant at the West Hollywood Station in 1970 or 1971. He recalled that defendant was at the scene of a vehicle fire in which an occupant of the vehicle perished. The next day, at a station meeting, defendant told his colleagues the vehicle door was jammed, and that he had retreated because of the heat and had watched a conscious passenger burn to death. According to Grant, defendant cried while describing the events and told his colleagues it occurred to him later that he could have broken the window with his flashlight or the butt of his gun. According to Grant, defendant "felt this man died because of him because he had panicked." Grant stated he never had seen an officer cry.

Robin Klein, a clinical psychologist, testified that law enforcement officers are exposed to many traumatic events, and that there is peer pressure within that profession to be strong and not to obtain counseling. According to Klein, law enforcement agencies in Southern California, prior to 1975, did not provide meaningful psychological assistance to officers. He stated that officers "have a much higher rate of suicide than the average person," as well as "a significant level of divorce." He stated that he would expect a "horrendous" psychological impact upon a person who witnessed someone die in a fire, particularly if the person is "paid to rescue people," and that it is not unusual for an officer "to resign usually within a couple of years after having been involved in a major traumatic incident."

Michael Mantell, a clinical psychologist, reviewed records concerning defendant, including school records, his application to the Los Angeles County Sheriff's Department, and the department's background investigation. Mantell testified he found nothing indicating any underlying psychological problems. Evaluations of defendant at the Firestone Station in 1969, 1970, and 1971 indicated that his performance was "competent." His first evaluation at West Hollywood Station, in October 1971, reflected that his performance was between "outstanding" and "competent." Defendant again was found "competent" in his 1972 evaluation, but the report noted some inadequacies in his compliance with rules, a failing that the report attributed to personal problems. Defendant voluntarily resigned on October 8, 1973, the day after the West Hollywood Station commander recommended that he undergo psychiatric evaluation. Mantell testified that a document dated October 19, 1973, indicated that defendant's conduct had become undependable, and that defendant required "constant and significant supervision." The document also stated that he was "visibly depressed." Mantell perceived a correlation between defendant's having witnessed the vehicle fire and his job

performance. Mantell also noted that defendant's divorce proceeding was pending from November 1972 to August 1973, and opined that "a psychological deterioration ha[d] been taking place, . . . through and including the divorce." Mantell testified that he would be surprised if any police department would hire a person with defendant's record at the sheriff's department. Finally, Mantell explained the term "anniversary reaction" as describing psychological symptoms that may develop one year, or many years, after a traumatic event. According to Mantell, it appeared that an incident of indecent exposure committed by defendant occurred approximately one year after he resigned from the sheriff's department and approximately two years after he witnessed the vehicle fire.

Norman Morein, a sentencing consultant, was retained to review documents related to defendant's previous imprisonment, from April 1983 to April 1993, and to evaluate defendant's adjustment to prison. He testified that defendant had "one of the best records I've ever seen," except for an escape attempt in 1986, when defendant cut through the bars of his cell, reached the prison compound, scaled one fence, began to scale a second fence, and was shot in the shoulder by a prison guard after ignoring the guard's command to halt and the guard's warning shot. According to Morein, defendant had no record of any assaultive or disrespectful conduct. In addition, defendant performed well at his work assignments, participated in vocational training in electronics and machine shop, and earned good grades in community college courses. Defendant was elected by inmates to the "Men's Advisory Council," which represented inmates in meetings with prison staff. Morein testified that defendant did not receive any psychiatric or psychological counseling while in prison, but was counseled for anger management beginning in December 1993. Morein confirmed on cross-examination that defendant has an IQ of 123, which he described as "in the superior range."

## II. DISCUSSION

### A. *Pretrial Issues*

1. *The detention and arrest of defendant, and the search of his vehicle*

Defendant moved in limine to suppress all evidence obtained as a result of the warrantless search and seizure conducted by United States Park Police Officer Robert Jansing on March 6, 1995, in San Francisco. The trial court denied the motion, without making express findings. Defendant contends his detention and arrest, and the subsequent search of his vehicle, violated his

rights under the Fourth Amendment to the United States Constitution, and that the evidence seized should have been excluded at trial.[6]

a. *Facts*

As recounted above, defendant was arrested on March 6, 1995, by Officer Jansing of the United States Park Police (Park Police). At the hearing on defendant's motion to suppress evidence, Jansing testified that he was assigned that day to patrol the northern end of the Golden Gate National Recreation Area, which includes Aquatic Park and Fort Mason. When on duty, Jansing drove his marked Park Police vehicle through the parking area of Gashouse Cove, a marina near Fort Mason. He testified that the parking area was owned by the San Francisco Recreation and Park District and was "mainly . . . for the yacht harbor," which was "right next to" the national recreation area. Jansing related that as he drove through the parking area, he noticed that the registration tag on the license plate of a brown Datsun sedan was not flat on the plate, indicating to Jansing that the tag might not belong to the plate to which it was affixed. Jansing estimated that the Datsun was parked approximately 100 yards from property owned by the federal government. As Jansing circled the parking area, he contacted his dispatch office to check the registration of the Datsun's license plate. In response, he was informed that the registration had expired in March 1994.

Jansing testified that he returned to the Datsun and parked his patrol car behind it. He then exited from his vehicle and asked defendant, who was in the driver's seat of the Datsun, for his driver's license and vehicle registration. Jansing testified that he informed defendant his registration was expired, and defendant responded that he recently had purchased the vehicle and did not know the source of the 1995 registration tag. According to Jansing, defendant also stated that he had a valid driver's license but did not have it in his possession. Defendant provided Jansing with what Jansing described as "some type of paperwork for the vehicle . . .—either a bill of sale—might have been an old registration showing that [the Datsun] was still in the name of somebody out of Canoga Park." Jansing testified that defendant told him he did not have any photographic identification with him, but he gave Jansing a birth certificate in the name of "Richard Redd" and said that was his name. Standing next to the driver's door of defendant's vehicle and using his portable police radio, Jansing contacted his dispatch office to determine whether "Richard Redd" had a valid driver's license. Jansing was informed that there was no record of such a license.

Jansing related that he informed defendant he believed defendant was not being truthful with respect to his name and that he wanted defendant's correct

---

[6] No issue has been raised by defendant related to the June 1, 1994, search of his apartment.

name, but defendant continued to claim his name was "Richard Redd." Jansing testified that he then asked defendant to step out of his vehicle and put his hands behind his back. According to Jansing, he then placed handcuffs on defendant and informed him that Jansing would find out who he was. When asked at the hearing his reason for putting handcuffs on defendant at that point, Jansing responded that he was arresting defendant for three violations—providing a false name, having no driver's license, and having an expired vehicle registration. When asked why he took defendant into custody, Jansing testified that the only way to determine defendant's identification to a certainty was to transport him in order to have his fingerprints checked.

Jansing testified that after placing handcuffs on defendant, he searched defendant, discovered a wallet in his back pocket, and found inside the wallet a driver's license in defendant's name. Using his police radio, Jansing informed his dispatch office of the name on the driver's license. Jansing learned from the dispatch office that there were arrest warrants for defendant related to murder, attempted murder, robbery, and a parole violation. Jansing requested and received confirmation of the warrants, and then requested that defendant's vehicle be impounded, which his shift sergeant approved. Jansing testified that he impounded the vehicle because the owner was unknown and could not be contacted, the registration was expired, and Jansing did not know whether the vehicle had been stolen. The officer acknowledged that the circumstance that defendant had been arrested also was a factor in deciding whether to impound the vehicle.

According to Jansing, Park Police General Order No. 2501 required that an inventory of an impounded vehicle be conducted. He stated that General Order No. 2501 was applicable to all federal Park Police officers, "regardless of the property they're on, as long as they're in the course of their official duties, impounding a vehicle pursuant to their arrest authority." Jansing identified the principal reason for the inventory requirement as potential liability for anything that might be in the vehicle. Pursuant to his understanding of what was required by Park Police policy, Jansing conducted a full inventory, including searching any compartments or closed containers, and also inspected the vehicle for damage. Jansing testified that, in the course of searching the vehicle, he found weapons and ammunition, which could not be allowed to remain in the vehicle while it was impounded. He also testified that because one of the arrest warrants had been issued on application of the Federal Bureau of Investigation (FBI) and the FBI had a local presence, the Park Police requested that FBI agents respond to the scene, and the Park Police turned over the weapons and ammunition to the FBI to be stored in a secure facility. Other items were left inside the vehicle, and an FBI agent directed that it be stored in the United States General Services Administration's secure facility.

After the vehicle, weapons, and ammunition were transferred to the FBI, Jansing transported defendant to the San Francisco County Jail, where defendant was booked on the arrest warrants. Although Jansing had prepared a citation relating to the Vehicle Code violations, he testified that he decided "it wasn't worth it," because he believed officials in San Francisco would not file charges on these less serious matters in light of the circumstance that defendant would be transferred to another county to face more serious charges.

Jansing also testified that he had received training to qualify him as a peace officer under section 832. He stated that he took an "832 course" through Santa Rosa Junior College, and produced his certificate of completion of the course. Jansing further testified that on the date he arrested defendant, he was authorized to act as a peace officer in San Francisco. He produced a letter from San Francisco's Chief of Police, Tony Ribera, conferring authority upon all Park Police officers, under section 830.8, subdivision (b), to act as peace officers in San Francisco.

Defendant testified at the hearing on his motion to suppress evidence that he had purchased the Datsun in early December 1994, and that he owned it at the time he was arrested. He also testified that after he gave Jansing the birth certificate, and after Jansing contacted someone on his radio, the officer demanded additional identification. In response, defendant testified, he looked through his wallet for some form of identification that would satisfy Jansing, "at which time [Jansing] snatched [the wallet] out of my hand and went through the wallet on his own volition." Defendant did not recall whether Jansing took the wallet before or after he ordered defendant out of the vehicle, but recalled that Jansing took it before handcuffing defendant, and that the wallet had been in defendant's hand, not in his back pocket. Defendant also testified that he gave Jansing other documents in addition to those that were presented in court, and that defendant's name was on a handwritten bill of sale that was among the documents he gave to Jansing.

Charles Trebbien, a parole agent with the California Department of Corrections, testified at the hearing that he was defendant's assigned parole agent from November 1993 to March 1995. Trebbien testified that defendant was involved in an incident in the City of Orange on May 31, 1994, in which a security guard was injured (presumably, the shooting of James Shahbakhti in front of the Vons market), which led Trebbien to request that a warrant be issued for defendant's arrest. On June 1, 1994, the Board of Prison Terms issued a warrant for defendant's arrest.

Jerry Brakebill, a police officer with the City of Brea, testified at the hearing that he was the detective assigned to investigate the homicide of

Timothy McVeigh on July 18, 1994, at the Alpha Beta market. On that date, he obtained a warrant for defendant's arrest in connection with the homicide. On March 6, 1995, the FBI notified Brakebill that defendant had been arrested in San Francisco. On March 7, 1995, a warrant to search the vehicle was issued in the County of Orange, and Brakebill traveled to San Francisco and searched the vehicle and its contents that same day.

b. *Analysis*

i. *Jansing's authority to arrest defendant*

Defendant contends Jansing, as a federal officer, lacked authority to detain and arrest defendant on property owned by the City and County of San Francisco. We disagree, concluding that Jansing acted within the authority set forth in section 830.8, subdivision (b): "Duly authorized federal employees who comply with the training requirements set forth in Section 832 are peace officers when they are engaged in enforcing applicable state or local laws on property owned or possessed by the United States government, or on any street, sidewalk, or property adjacent thereto, and with the written consent of the sheriff or the chief of police, respectively, in whose jurisdiction the property is situated."

Defendant urges us to reject the application of section 830.8 on four grounds: (1) the prosecution did not attempt to justify the seizure on the ground that it occurred "adjacent" to federal property, and therefore cannot rely upon this theory on appeal (2) the arrest did not occur on property "adjacent" to federal property, (3) the prosecutor failed to prove that the head of Jansing's agency certified Jansing's relevant training, and (4) Jansing did not have authority to use a marked police vehicle to enforce state laws.

First, it is clear the prosecution contended that the arrest was effected on property "adjacent" to federal property, as authorized by section 830.8, subdivision (b). In its opposition to the motion to suppress, the prosecution stated that Jansing had peace officer status because he had completed the training under section 832, and that the Park Police had the written consent of the chief of police to act as peace officers in San Francisco. In support of this contention, the prosecution cited section 830.8, subdivision (b). It was not required that the prosecution address in the trial court every factor set forth in subdivision (b) in order to rely upon this provision on appeal.

Second, defendant contends the parking lot in which he was arrested is not "adjacent" to federal property, because the parking area is separated from Fort Mason by a yacht harbor, and because the driving distance between the entrance to Fort Mason and the location where defendant was arrested is,

according to counsel's calculations on appeal, 595 yards. He asserts "[t]he Legislature's intent was to limit the reach of federal officers to streets, sidewalks and similar property where offenders might stand and do damage to federal property." Defendant did not challenge Jansing's authority on this basis in the trial court. Therefore, he has forfeited this issue. (See *People v. Williams* (1999) 20 Cal.4th 119, 129 [83 Cal.Rptr.2d 275, 973 P.2d 52] (*Williams*) ["when defendants move to suppress evidence under section 1538.5, they must inform the prosecution and the court of the specific basis for their motion"].)

■ Even if defendant had preserved this contention, his argument would fail. The legislative history of section 830.8, subdivision (b), establishes that the term "adjacent" was not intended to restrict the area within which duly authorized federal employees act as peace officers to locations on nonfederal property that are within "striking" distance of federal property. The extension of federal officers' authority to "adjacent" property was proposed in Assembly Bill No. 3874 (1983–1984 Reg. Sess.) (Assembly Bill 3874) during the 1984 legislative session. A report of the Senate Committee on Judiciary concerning this proposed legislation stated that "[t]he purpose of the bill is to allow U.S. Park Police officers patrolling the Golden Gate National Recreation Area to make valid arrests in the surrounding community." (Sen. Com. on Judiciary, Rep. on Assem. Bill 3874 (1983–1984 Reg. Sess.) as amended Aug. 6, 1984, p. 2.) The report explained that "[t]he U.S. Park Police patrolling the Golden Gate National Recreation Area spend a considerable amount of time driving on city streets and highways in marked police vehicles. Consequently, these officers are often called on for assistance by the general public and have many times apprehended criminal suspects outside of their primary area of responsibility—i.e., the federally-owned property."[7] (Sen. Com. on Judiciary Rep. on Assem. Bill 3874, *supra*, at pp. 2–3.) Based upon Jansing's testimony that the parking area where he arrested defendant served Gashouse

---

[7] Defendant notes that, as introduced on February 17, 1984, Assembly Bill 3874 would have authorized Park Police officers to exercise their police powers "statewide," and that an amendment made on May 22, 1984, instead authorized them to exercise their police powers on property adjacent to federal property. Defendant cites this amendment in support of his view that the term "adjacent" must be narrowly construed. The report of the Senate Committee on Judiciary, however, addressed Assembly Bill 3874 *as amended August 6, 1984*. Thus, the legislative history discussed above supports the view that the term "adjacent" was intended to encompass "the surrounding community" through which these federal officers travel as they patrol the Golden Gate National Recreation Area.

Defendant also cites the observation in the legislative history that the general public calls upon these officers for assistance, and complains that "Jansing was not responding to a citizen's call for assistance. He was using this provision to basically 'take a stroll' through a parking lot that was not in a direct route to any federal property." We find nothing in the language of the statute or the legislative history indicating an intent to limit the authority of federal employees to those situations in which a member of the public has requested assistance.

Cove, which was "right next to" the national recreation area, the arrest clearly was made on property "adjacent" to federal property within the meaning of section 830.8.[8]

■ In a related contention, defendant asserts that section 830.8, subdivision (b) is unenforceable because the term "adjacent thereto" is vague. He relies upon the statement in *Kolender v. Lawson* (1983) 461 U.S. 352 [75 L.Ed.2d 903, 103 S.Ct. 1855], that "[w]here the legislature fails to provide . . . minimal guidelines [to govern law enforcement], a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' [Citation.]" (*Id.* at p. 358.) *Kolender* was referring to minimum guidelines concerning the elements of a crime. As *Kolender* explained, "the void-for-vagueness doctrine requires that a penal statute *define the criminal offense* with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.]" (*Id.* at p. 357, italics added.) In the present case, the alleged vagueness is unrelated to the definition of any crime.

Third, defendant complains that the prosecution failed to prove that Jansing was "certified by [his] agency head[] as having satisfied the training requirements of Section 832 . . . ." (§ 830.8, subd. (a).) Although defendant asserted in his motion to suppress that the prosecution was required to establish that "Jansing has satisfied the training requirement or its equivalent of both §§ 830.8(a) and (c)," he raised no issue concerning certification by Jansing's agency head. Therefore, defendant has forfeited this issue. (See *Williams, supra*, 20 Cal.4th at p. 129.)

Even if defendant had preserved this contention for appeal, it would fail. The requirement that the agency head certify that the officer has satisfied the training requirements is found in subdivision (a) of section 830.8, which sets forth various circumstances under which federal criminal investigators and law enforcement officials "may exercise the powers of arrest of a peace officer . . . ." As explained above, Jansing was authorized to act pursuant to subdivision (b), which provides that duly authorized federal employees "are

---

[8] Defendant suggested at oral argument that reliance upon the reference to "the surrounding community" in the legislative history would lead to the conclusion that federal officers patrolling federal land adjacent to property that comes within the jurisdiction of the City and County of San Francisco are "peace officers" *throughout* the city and county. In context, "the surrounding community" appears to refer to areas that federal officers might traverse as they patrol federal land, and does not appear to be synonymous with the surrounding "jurisdiction." The evidence presented in the trial court, as well as maps submitted by defendant on appeal establishes not only that defendant's arrest occurred within the jurisdiction that borders federal land; they also establish that the arrest occurred in an area, "right next to" federal land, that a federal officer might traverse on patrol.

peace officers" when they enforce state and local laws in specified areas. As originally enacted, subdivision (b) applied only where the enforcement of state or local laws occurred *on property owned or possessed by the federal government,* with the written consent of the local sheriff or chief of police; the original version did not include any training requirement. When the Legislature amended subdivision (b) to extend its reach to federal employees who engage in law enforcement on property *adjacent to* federal property, the Legislature restricted the subdivision's reach to federal employees "who comply with the training requirements set forth in Section 832 . . . ." It did not, however, include the requirement imposed in the circumstances addressed in subdivision (a)—that the investigators and officers "shall have been certified by their agency heads as having satisfied the training requirements of Section 832 . . . ." Thus, in order to establish Jansing's status as a "peace officer" under subdivision (b), the prosecution was not required to establish that his agency head certified he satisfied the training requirements set forth in section 832.[9]

Fourth, defendant contends Jansing did not have authority to use a marked police vehicle to enforce state laws, citing an opinion of the Attorney General. (80 Ops.Cal.Atty.Gen. 297 (1997).) Defendant did not advance this contention in the trial court, and therefore has forfeited it. (See *Williams, supra,* 20 Cal.4th at p. 129.) Even if defendant had preserved this contention on appeal, it would fail. The Attorney General opinion upon which defendant relies focused upon subdivision (a) of section 830.8, and concluded that Federal Protective Service (FPS) officers "are not peace officers as that term is defined in sections 830 to 832.9. (§ 830.8, subd. (a).) Nothing in section 830.8 authorizes FPS officers to use marked police vehicles or other emergency equipment when enforcing state or local laws." (80 Ops.Cal.Atty.Gen. at p. 305.) As noted above, Jansing was not merely exercising arrest powers under section 830.8, subdivision (a); rather, he was a "peace officer" under subdivision (b). Furthermore, as the legislative history set forth above reflects, a principal focus of the amendment was federal officers who "spend a considerable amount of time driving on city streets and highways *in marked police vehicles.*" (Sen. Com. on Judiciary, Rep. on Assem. Bill 3874, *supra,* pp. 2–3, italics added.) Accordingly, it is clear that among the federal

---

[9] Contrary to defendant's assertion at oral argument that the requirements of both subdivisions (a) and (b) of section 830.8 must be satisfied, the plain language of these two subdivisions reflects that they provide independent bases for validating a federal officer's actions. Not only do the two subdivisions set forth distinct circumstances in which a federal employee is authorized to act, but subdivision (a) addresses only the authority to exercise the powers of arrest, whereas subdivision (b) provides that federal employees who come within its provisions "are peace officers." In addition, if the Legislature had intended the requirements of subdivision (a) to apply when an officer is acting pursuant to the authority granted in subdivision (b), there would have been no reason to include the same training requirement in both subdivisions.

employees whose actions were to be ratified by the amendment to subdivision (b) were those who carried out their duties in marked police vehicles. For these reasons, we reject defendant's contention.

Because we conclude Jansing had authority under section 830.8, subdivision (b), to act as a peace officer when he arrested and searched defendant, we need not address whether Jansing also may have acted properly pursuant to subdivision (a) of section 830.8, or as a private citizen.

### ii. *Validity of the arrest and search*

A defendant may move to suppress evidence on the ground that "[t]he search or seizure without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).) A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. (*Williams, supra,* 20 Cal.4th 119, 127.) "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729] (*Glaser*); see *People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].)[10] As explained below, we conclude the prosecution established that the search of defendant and his vehicle was reasonable.

"Vehicle Code sections 4462 and 12951 long have required that the person in the immediate control of an automobile present evidence of registration and a driver's license upon proper command of a peace officer." (*In re Arturo D.* (2002) 27 Cal.4th 60, 67 [115 Cal.Rptr.2d 581, 38 P.3d 433], fn. omitted.) Upon defendant's failure to provide a valid registration and his provision of false identification of himself as "Richard Redd," Jansing had authority to place defendant under arrest. (See § 148.9, subd. (a) [any person who falsely identifies himself to a peace officer upon lawful detention or arrest to evade his proper identification by the investigating officer is guilty of a misdemeanor]; Veh. Code, § 4000 [no person shall leave standing in an offstreet public parking facility any vehicle unless it is registered].) Moreover, Jansing had authority to search defendant incident to this arrest. (*United States v. Robinson* (1973) 414 U.S. 218, 235 [38 L.Ed.2d 427, 94 S.Ct. 467] ["A custodial arrest of a suspect based on probable cause is a

---

[10] Defendant's authority to the contrary is inapposite. The standard of review set forth in *Wiggins v. Smith* (2003) 539 U.S. 510, 530–531 [156 L.Ed.2d 471, 123 S.Ct. 2527], and *Taylor v. Maddox* (9th Cir. 2004) 366 F.3d 992, 1014, relates to review by federal courts of state court judgments in the context of habeas corpus proceedings.

reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."].)[11]

Defendant asserts, however, that Jansing's testimony concerning the arrest was not credible, and that this court should accept defendant's version of the events, "which established that Jansing seized the wallet before checking on the identification offered by appellant." Defendant's testimony does not establish defendant's version of the events.[12] Instead, defendant bases his assertion upon trial counsel's calculation that only 26 seconds elapsed between the time the dispatch office stated that there was no record of "Richard Redd," and the time Jansing informed that office of defendant's true identity and driver's license number. Because 26 seconds assertedly was too short a period of time for Jansing to have ordered defendant out of his vehicle, placed him in handcuffs, found defendant's driver's license in his pocket, and relayed the information to the dispatch office, defendant concludes Jansing must have seized the wallet before Jansing learned there was no record of a driver's license for "Richard Redd" and before he arrested defendant.

In light of the circumstance that Jansing was communicating with the dispatch office by way of a portable radio while he stood next to the door of defendant's vehicle, we do not find it incredible that only 26 seconds (according to trial counsel's calculations) may have elapsed between the time Jansing ordered defendant out of his vehicle and the time he radioed defendant's true name to the dispatch office. We also reject defendant's contention that we should question Jansing's credibility because he could not recall various facts, such as whether other vehicles in the parking area were occupied, whether he used a key to open the vehicle's trunk, and whether he contacted the FBI before opening the trunk. None of these asserted lapses of

---

[11] We note that even if the arrest were not proper *under state law*, the search of defendant incident to the arrest would not be a violation of the Fourth Amendment. (*Virginia v. Moore* (2008) 553 U.S. 164, 171, 177 [170 L.Ed.2d 559, 128 S.Ct. 1598, 1604, 1607] ["when an officer has probable cause to believe a person committed even a minor crime in his presence, . . . [t]he arrest is constitutionally reasonable" and "[t]he interests justifying search are present whenever an officer makes an arrest"]; *People v. McKay* (2002) 27 Cal.4th 601, 618 [117 Cal.Rptr.2d 236, 41 P.3d 59] ["so long as the officer has probable cause to believe that an individual has committed a criminal offense, a custodial arrest—even one effected in violation of state arrest procedures—does not violate the Fourth Amendment"].) Absent a federal constitutional violation, the exclusionary rule does not apply. (Cal. Const., art. I, § 28; *In re Lance W.* (1985) 37 Cal.3d 873, 879, 890 [210 Cal.Rptr. 631, 694 P.2d 744].)

[12] As noted above, defendant testified that after Jansing contacted someone on his radio, Jansing demanded other identification, at which point defendant looked through his wallet. Defendant also testified that Jansing took the wallet "either just prior to him ordering me out of the car or just after. I recall him looking over me as I was going through the wallet, but I can't remember if I was still in the car or just after I stepped out." Thus, defendant's testimony disputed only the details of how the wallet was seized during the arrest, and did not establish that Jansing seized the wallet before checking the identification provided by defendant.

memory suggests that Jansing was untruthful with respect to the facts he recalled. Therefore, we accept the trial court's implied finding that the search was conducted during or after the arrest, a finding supported by Jansing's testimony. (See *Glaser, supra*, 11 Cal.4th at p. 362 ["We defer to the trial court's factual findings, express or implied, where supported by substantial evidence."].)

In any event, even if Jansing had seized the wallet before he began effecting the arrest, the evidence thereby obtained would not be subject to exclusion. It is undisputed that Jansing already had contacted his dispatcher concerning the birth certificate. Therefore, Jansing would have learned, without the information gained from the wallet, that defendant was not Richard Redd. Thus, the wallet inevitably would have been discovered in the search of defendant incident to the arrest that Jansing effected based upon the Vehicle Code violations and defendant's having provided a false name. (*Nix v. Williams* (1984) 467 U.S. 431, 444 [81 L.Ed.2d 377, 104 S.Ct. 2501].) Accordingly, even under defendant's factual theory on appeal, the exclusionary rule would not apply.

Because Jansing had arrested defendant, and because the vehicle's registration had expired more than six months earlier, Jansing had authority under state law to impound defendant's vehicle. (Veh. Code, § 22651, subds. (h)(1) [an officer may remove a vehicle when the officer effects a valid arrest of the person in control of the vehicle] & (*o*)(1) [a peace officer may remove a vehicle found on an off-street parking facility with a registration expiration date in excess of six months prior to the date the vehicle is found].) Having impounded the vehicle, Jansing had authority to conduct an inventory of the vehicle's contents "aimed at securing or protecting the car and its contents." (*South Dakota v. Opperman* (1976) 428 U.S. 364, 373 [49 L.Ed.2d 1000, 96 S.Ct. 3092].)[13] The record establishes that Jansing's inventory was conducted for the purpose of securing and protecting the vehicle's contents. Jansing testified that he followed Park Police General Order No. 2501, which states: "Inventory procedures serve to protect an owner's property while it is in the custody of the Force, to ensure against claims of lost, stolen or vandalized property, and to protect officers from danger. A vehicle should not be released to a crane service until it has been inventoried. The impounding officer shall conduct a thorough inventory of the vehicle as soon as possible after it is impounded. The officer shall open closed containers whose contents the officer is unable to ascertain from the container's exterior and characteristics." (*Id.*, § 2501.06(A), p. 6.) This testimony also established that the inventory was conducted pursuant to standard criteria, and that Jansing was

---

[13] Because we conclude Jansing properly impounded the vehicle and conducted an inventory search, we need not address the issue whether the vehicle search also would have been proper as incident to defendant's arrest.

"not allowed so much latitude that [the search could turn] into 'a purposeful and general means of discovering evidence of crime,' [citation]." (*Florida v. Wells* (1990) 495 U.S. 1, 4 [109 L.Ed.2d 1, 110 S.Ct. 1632] (*Wells*); see also *Colorado v. Bertine* (1987) 479 U.S. 367, 374, fn. 6 [93 L.Ed.2d 739, 107 S.Ct. 738] (*Bertine*) ["Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria."].)

■ Defendant asserts that because the search occurred on city and county property, the People were required to establish that the local authorities had a property inventory search policy and that Jansing complied with that policy. He fails to cite any pertinent authority in support of this contention. Moreover, the reasons supporting the requirement that an inventory search be conducted pursuant to an established policy support the conclusion that Jansing satisfied this constitutional requirement by following the policy of the Park Police. The requirement of established procedures "is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory." (*Wells, supra*, 495 U.S. at p. 4.) In addition, in rejecting an argument that the police should weigh whether a thorough inventory is appropriate, the United States Supreme Court has observed that " ' "[a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." ' [Citation.]" (*Bertine, supra*, 479 U.S. at p. 375.) The purpose of countering "general rummaging" does not require that the Park Police follow the policy of the jurisdiction in which they temporarily act as peace officers; the purpose of providing "a single familiar standard" is served by a rule requiring that the Park Police follow the federal policy in all circumstances. Defendant provides no reason to impose a different requirement.

■ Because the warrantless arrest and search of defendant and the warrantless search of his vehicle were lawful, we need not address the question whether the affidavit supporting issuance of the search warrant obtained the following day by the Brea police would have supported issuance of a search warrant, absent the information obtained through Jansing's search. In light of our conclusion that Jansing's actions were a lawful response to defendant's failure to provide a valid driver's license and vehicle registration, we need not address whether the officer's actions also were justified by defendant's parole status.

## 2. *Defendant's motion for a lineup*

On July 19, 1996, defendant moved for an order compelling the attendance of Dean Bugbee at a pretrial lineup.[14] On appeal, he contends the trial court's denial of the motion was an abuse of discretion and violated his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

We concluded in *Evans v. Superior Court* (1974) 11 Cal.3d 617 [114 Cal.Rptr. 121, 522 P.2d 681] (*Evans*) that "due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate. The right to a lineup arises, however, only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Id.* at p. 625.) We also concluded that "[t]he questions whether eyewitness identification is a material issue and whether fundamental fairness requires a lineup in a particular case are inquiries which necessarily rest for determination within the broad discretion of the magistrate or trial judge." (*Ibid.*) Finally, with respect to whether such a motion is timely, we stated that the "motion should normally be made as soon after arrest or arraignment as practicable. We note that motions which are not made until shortly before trial should, unless good cause is clearly demonstrated, be denied in most instances by reason of such delay." (*Id.* at p. 626.)

In the present case, the trial court denied the motion for a pretrial lineup on the grounds that there did not exist a reasonable likelihood of mistaken identification, and that the motion was untimely. As explained below, the record supports these conclusions, and we find no abuse of discretion in the court's ruling.

Defendant was arrested on March 6, 1995, and made his first court appearance on March 13, 1995, at which time the public defender was appointed to represent him. At the preliminary hearing conducted on June 9, 1995, Detective Sergeant Larry Pore of the Orange Police Department testified concerning Dean Bugbee's identification of defendant in a photographic lineup held on June 16, 1994, in connection with the robbery of

---

[14] The motion sought to compel the attendance of "percipient witnesses." The declaration of counsel in support of the motion addressed counts one and two, which involved the March 13, 1994, burglary and robbery at the Sav-on drugstore, and referred to both Dean Bugbee and Eric Tomsons, another Sav-on employee. The proposed order also referred to Bugbee and Tomsons. At the hearing on the motion, defense counsel referred to "this particular witness," and to the issue of whether "the victim [is] able to make an identification." Thereafter, both sides referred only to Bugbee. On appeal, defendant describes the motion as seeking a lineup at which Bugbee would appear, and discusses only Bugbee's testimony. Therefore, we consider only the applicability of our analysis to Bugbee.

Bugbee at the Sav-on drugstore in March 1994. Defense counsel cross-examined Pore concerning Bugbee's photographic identification and requested that the original photographic lineup be made available, stating, "I'm unable to assess whether there's any suggestiveness within the spread" by viewing only the copy available at the preliminary hearing.

On July 19, 1996, more than a year after these preliminary proceedings, defendant filed his motion for an order requiring that Bugbee appear at a lineup. The motion stated that "the identification procedures used previously by law enforcement create a reasonable likelihood of mistaken identity." The supporting declaration of counsel stated that Sav-on employee Eric Tomsons provided a description of the crime similar to the description provided by Bugbee, but Tomsons did not identify defendant when shown a photographic lineup. The declaration also described Bugbee's identification of defendant's photograph as "the closest," based upon the shape of the face and Bugbee's statement that if dark glasses were added, he would state the subject was the person who robbed him. The declaration also recited that Bugbee indicated he could positively identify the suspect if he were to see him in person.

The hearing on the motion was held on August 16, 1996, less than two months before the October 7 trial date. In response to the prosecution's contention that the motion was untimely, defense counsel stated there was a large amount of discovery, and "as a practical matter the defense could not have sifted through that discovery and made a request [for a lineup] on time." Counsel also theorized that "timeliness [is] a relative thing because the case was so old by the time it actually started its journey through the court system, my position would be that the additional delay to this point doesn't really change things." In other words, according to counsel, Bugbee's identification would not have been more accurate at the time of arraignment than when the motion for a lineup was heard. Counsel also claimed that "we do not have any other evidence that links [defendant] to this crime in terms of physical findings, ballistics, anything of that nature." The prosecution disputed the contention that it had been impracticable to request a lineup earlier, and asserted that circumstantial evidence also demonstrated that defendant committed the crime.

The court concluded Bugbee was a material witness, but denied the request for a lineup, stating: "I cannot make a finding there exists a reasonable likelihood of mistaken identification." The court cited as another basis for its decision the circumstance that there had been sufficient opportunity for defendant to request the lineup at an earlier time. Finally, it noted the approaching trial date.

Defendant does not address the trial court's conclusion that there was no reasonable likelihood of mistaken identification. In any event, the trial court

did not abuse its discretion in so concluding. As set forth in defense counsel's declaration, Bugbee picked defendant's photograph from the lineup, said that if dark glasses were added he would state the subject was the person who robbed him, and indicated he could positively identify the suspect if he saw him in person. The circumstance that another employee, who was not robbed by defendant, could not identify defendant from the photographs did not compel the trial court to conclude there was a reasonable likelihood of mistaken identification by Bugbee. In the absence of a reasonable likelihood of a mistaken identification, defendant had no right under *Evans, supra*, 11 Cal.3d at page 625, to a lineup.

In addition, defendant fails to establish that the trial court abused its discretion in finding the motion to be untimely. He notes our statement in *Evans* that "[d]ilatory or obstructive tactics made under the guise of seeking discovery but which tend to defeat the ends of justice will necessarily be weighed heavily on timeliness grounds against the granting of the motion within discretionary limits" (*Evans, supra*, 11 Cal.3d at p. 626), and states there was no evidence of dilatory or obstructive tactics. But *Evans* does not require evidence of such tactics. Rather, we stated that a motion for a lineup "should normally be made as soon after arrest or arraignment as practicable." (*Ibid.*) Here, the trial court reasonably concluded that the motion could have been made earlier. We also stated in *Evans* that "motions which are not made until shortly before trial should, unless good cause is clearly demonstrated, be denied in most instances by reason of such delay." (*Ibid.*) Here, the motion was made shortly before trial, and defendant did not clearly demonstrate good cause for his delay. For all of these reasons, we conclude the trial court did not abuse its discretion in denying defendant's motion for a lineup.

### B. *Guilt Phase Issues*

#### 1. *Defense counsel's reference to defendant during his opening statement*

Defendant contends that during defense counsel's opening statement, counsel conceded defendant's guilt with respect to the charges of attempted murder of Shahbakhti and Weidmann, and thereby provided ineffective assistance of counsel. As explained below, the record establishes that counsel did not concede defendant's guilt, and that counsel's reference to defendant during his opening statement did not constitute ineffective assistance of counsel.

In the course of his opening statement, defendant's counsel reviewed some of the factual allegations surrounding the charges. First, he described the robbery of Dean Bugbee at the Sav-on drugstore, highlighting circumstances

that would have impeded a clear identification of "the robber," and discrepancies between Bugbee's description of defendant's height and age and defendant's actual height and age. Next, he described the incident in front of the Vons market, in which James Shahbakhti was shot, stating that "[a] fellow pulled up in a vehicle and drove through the complex. At first he noticed a man later identified as Stephen Redd walking in a different part of the strip mall over in front of a karate studio. [¶] Eventually after a few minutes *Mr. Redd is observed walking in front of the Von's store*. At that point in time the unarmed security guard accosted him, stops him. Apparently the subject is just walking through and he stops the person. [¶] The person says hi, leave me alone. The security guard demands he stay there." (Italics added.) Throughout the rest of this description, defense counsel referred to the individual as "the person," "the stopped person, "that person," "him," "that subject," "he," "the subject," and "the gunman."[15] Defense counsel then described the robbery and homicide at the Alpha Beta market, referring to the perpetrator as "a man," "the man," "he," "the robber," "that subject," and "the gunman."

In support of his contention that counsel conceded his guilt, defendant relies in part upon the prosecutor's related comments during his opening argument. After reviewing how he had laid out his case during his opening statement, the prosecutor stated that he had listened closely to the defense's opening statement to hear what the defense would be. He stated that defense counsel carefully had avoided stating who had committed the crimes, but when counsel had reviewed the attempted murder counts, "he started off by saying that Mr. Redd was by a karate studio and he came up and was talking to security guards, but then he changed what he said about the shooting. He said—he started calling him this person and that person, never saying it was Mr. Redd. . . . [¶] . . . He says the gunman rips off a number of shots. He

---

[15] The rest of counsel's description relating to the incident states: "[The security guard] in essence detains him if I can use that word. The person is observed to say a number of times leave me alone, let me go. [¶] Eventually a second security guard shows up in a separate vehicle, pulls up close to where the other two men are standing and he hears the stopped person saying I just want to leave, let me go, let me go and I'll go. [¶] Apparently that person gets a little more excited and agitated. The security guards do not allow him to leave. At some point that subject produces a handgun. They don't see where it comes from, but he produces a gun. [¶] Now, the security guards, it's true, they aren't armed. They are not carrying a side arm the way a regular peace officer does, but they do have something with them that's of concern to the subject. They each have a vehicle and in each vehicle is a radio that they can use to contact the police. [¶] The two men at some point in the sequence, it's a little unclear, you'll hear how they describe it, run towards their vehicles. The gunman rips off a number of shots, somewhat wild. One of the fellows is hit in the shoulder and goes down. The other is untouched, but the gunman achieves his purpose. He's able to flee on foot and get away from the scene. [¶] What you infer about the gunman's state of mind, what he intended, whether he was attempting to kill or just achieve another objective, keep them away from their radios, make his escape. Those are things to discuss later. But he does get away."

never says that it's Mr. Redd. He always says it's a gunman, that person." The prosecutor then stated, "Well, I was wondering are they saying it's the defendant or not." He then observed that in reviewing the Alpha Beta incident, defense counsel "[n]ever [said] it was Mr. Redd." The prosecutor concluded, "So I don't know what the defense is in this case. I don't know if they are saying now it's Mr. Redd now that all this evidence has come in or if they are still saying it's some robber, we don't know who it is . . . ." The prosecutor then undertook "to show you why what the attorneys say is not evidence," and reviewed various statements defense counsel had made during his opening statement that, according to the prosecutor, were not established by the evidence. Subsequently, in the course of reviewing the evidence, the prosecutor stated, "So I think the defense is going to say he didn't do it."

Viewed in context, defense counsel's reference to the presence of "Mr. Redd" in front of the Vons market was not a concession that defendant was the individual involved in that incident. Defense counsel had noted that the individual seen in front of the karate studio had been identified subsequently as defendant, and counsel's reference to "Mr. Redd" in the next sentence reflected that this was the same individual who was seen in front of the Vons market. Counsel then returned to his practice of referring to the perpetrator of the charged crimes without identifying him. As the prosecutor emphasized in his opening argument, the defense was careful not to state that defendant was the perpetrator. The prosecutor's arguments did not claim defense counsel had conceded guilt; rather, the comments highlighted what the prosecutor believed to be uncertainty with respect to the defense to the charges. Following the prosecutor's opening argument, defense counsel's argument emphasized flaws and discrepancies in the description and identification of the gunman in connection with the shooting in front of the Vons market, and continued to refer to the gunman generally, without identifying him as defendant. We also note that the jury repeatedly was informed that the statements of counsel are not evidence.[16]

In these circumstances, it is doubtful that a reasonable juror would have understood counsel's statement to be a concession that defendant was the individual involved in the incident that took place in front of Vons market. In addition, even if a reasonable juror had understood the comment as conceding defendant was the gunman, the concession would have made no difference to the outcome, because the evidence identifying defendant as the perpetrator

---

[16] The trial court emphasized before opening statements that "what counsel says during opening statement is not evidence, should not be considered by you as evidence. [¶] It simply affords them an opportunity to outline for you what they anticipate the evidence will be." Defense counsel began his opening statement by stating, "As the court cautioned earlier what the lawyers say is not evidence." As noted above, the prosecutor emphasized in his opening argument that what the lawyers said was not evidence. Finally, the court instructed the jury that "statements made by the attorneys during the trial are not evidence."

was overwhelming. Not only did Shahbakhti identify defendant, but Joseph Loya witnessed defendant's vehicle leaving the area; Officer King saw defendant in the vicinity where defendant's vehicle was parked; Detective Harper found bullets in defendant's apartment that matched the type used in the Vons market shooting, and the firearm found in defendant's vehicle matched the shell casings and bullets recovered at the scene. Therefore, counsel's performance in this respect was neither deficient nor prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

### 2. *Out-of-court identifications*

Defendant contends the admission of the out-of-court identifications violated his rights under the confrontation clause of the Sixth Amendment to the United States Constitution, and Evidence Code section 1238.

As set forth above, Dean Bugbee, James Shahbakhti, and Brenda Rambo testified at trial concerning their out-of-court identifications of defendant in photographic lineups. When the prosecutor asked Bugbee which of the photographs he had selected, defense counsel stated, "[o]bjection under section 1238, not adequate foundation." The court overruled the objection. Defendant did not object to the subsequent testimony of Shahbakhti and Rambo concerning their out-of-court identifications of defendant.

Evidence Code section 1238 establishes an exception to the hearsay rule for a statement that identifies a party or other person as a participant in a crime or other occurrence, "if the statement would have been admissible if made by [the witness] while testifying . . . ." The statute requires that the statement have been made when the crime was fresh in the witness's memory, and that "[t]he evidence of the statement is offered after the witness testifies that he [or she] made the identification and that it was a true reflection of his [or her] opinion at that time." (Evid. Code, § 1238.)[17]

Defendant complains that "[n]one of the witnesses testified, prior to the introduction of the out-of-court identifications that he or she '*made the identification and that it was a true reflection of his [her] opinion at that*

---

[17] Evidence Code section 1238 provides in full: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and:

"(a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence;

"(b) The statement was made at a time when the crime or other occurrence was fresh in the witness'[s] memory; and

"(c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time."

*time.'* " (Italics as added by defendant.) Our review of the record, however, reflects that the italicized requirements were met. The prosecutor asked Bugbee, "were you able to make an identification of any of the individuals as being . . . the person who committed the robbery?" Bugbee responded, "Yes." In the course of reviewing Bugbee's out-of-court identification, the prosecutor noted that the person in the photograph had a beard and mustache, and asked, "But yet you felt this was the person, number three?" Bugbee responded, "Yes." The prosecutor also asked, "when you made this identification were you trying to be as accurate as possible in pointing this person out to the police?" Again, Bugbee answered, "Yes." Finally, the prosecutor asked, "Would you have made this identification if you didn't feel this was the person." Bugbee responded, "No, I wouldn't."

Defendant did not object to the testimony of Shahbakhti and Rambo concerning their out-of-court identifications, and therefore forfeited his contention as to these witnesses. (Evid. Code, § 353; see *People v. Dykes* (2009) 46 Cal.4th 731, 756 [95 Cal.Rptr.3d 78, 209 P.3d 1] (*Dykes*) ["numerous decisions by this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].)[18] These claims also would fail on the merits, because the record establishes that each of these witnesses testified that he or she made an identification and that the identification reflected his or her opinion at that time. The prosecutor asked Shahbakhti, "After being shown a series of six photographs, were you able to focus your attention on one of those individuals?" Shahbakhti responded, "Yes, one looked just pretty much like who the individual was." The prosecutor also asked him, "And the person that you were 90 to 95 percent sure of was photo number three in exhibit ten; is that accurate?" Shahbakhti responded, "That's correct." Similarly, the prosecutor asked Rambo, "After you looked at these photographs, did you then circle and date and put your initials on an individual who you selected as a person being either the person

---

[18] Defendant attempts to excuse his failure to object, claiming that further objections would have been futile. He cites *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*), in which defense counsel "was subjected to a constant barrage of [the prosecutor's] unethical conduct" after having made a number of unsuccessful objections. (*Id.* at p. 821.) We noted in *Hill* that defense counsel "was thrust upon the horns of a dilemma" (*ibid.*)—he could continue to object and provoke the trial court's displeasure and derogatory statements in front of the jury, or he could refrain and risk prejudice to his client. "Under these unusual circumstances, we conclude [defense counsel] must be excused from the legal obligation to continually object, state the grounds of his objection, and ask the jury be admonished. On this record, we are convinced any additional attempts on his part to do so would have been futile and counterproductive to his client. [Citations.]" (*Ibid.*) The record in the present case does not establish any basis to excuse the defense's failure to object. Defendant objected on one occasion, stating only "Objection under section 1238, not adequate foundation," and the trial court stated only, "Overrule the objection and permit the witness to testify."

or similar looking to the person who had robbed you?" Rambo responded, "Yes." The prosecutor also asked, "And when you circled that, who did you circle that to represent? Who was that person that you selected?" Rambo responded, "The man that robbed me."

To the extent defendant's challenge rests upon *the sequence* in which the testimony was admitted—the trial court admitted the hearsay statements *before* it required the declarant to testify that he or she "made the identification and that it was a true reflection of his [or her] opinion at that time" (Evid. Code, § 1238, subd. (c))—the error was harmless, because it is not "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error" (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*)). The order in which the evidence concerning the out-of-court statements was admitted could not have made any difference in the outcome.

 Defendant also contends that the admission of out-of-court identifications violates a defendant's right under the Sixth Amendment to confront witnesses, even when the declarant testifies. He did not raise an objection below based upon the confrontation clause, and therefore has forfeited this claim. (*Dykes, supra,* 46 Cal.4th at p. 756; *People v. Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712] [a hearsay objection did not preserve a claim under the confrontation clause].)[19] Even if the claim had been preserved, it would fail. As the United States Supreme Court reiterated

---

[19] Defendant contends he preserved his constitutional claim by stating in a pretrial pleading, "[w]ith regard to any motion, objection, request, and/or exception, [defendant] relies upon the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution." With respect to this pleading, defense counsel explained to the trial court, "some of the federal cases suggest if I object and simply say hearsay and don't add the magic words, it [forfeits] my client's rights according to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution, some way waiving my right to bring this up."

When "new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution . . . [a] defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) Defendant's objection below, however—that the testimony did not come within a state-law exception to the hearsay rule because it lacked an adequate foundation—presented legal issues different from those underlying an objection that the admission of testimony would violate the confrontation clause. Therefore, defendant's new objection on appeal is not merely a constitutional "gloss" upon an objection raised below, and is forfeited.

Defendant also cites *People v. Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17], which recognized that a defendant need not anticipate unforeseen changes in the law and make objections based upon the hope that the law will change. Defendant notes that *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], established a new rule of law concerning the confrontation clause, requiring the exclusion of "testimonial" statements even if they appear to be reliable. Defendant's contention on appeal, however, is unrelated to that new rule; rather, as reflected in our discussion of the merits of his contention, he is

in *Crawford v. Washington, supra*, 541 U.S. 36, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green*, 399 U.S. 149, 162 [26 L.Ed.2d 489, 90 S.Ct. 1930] (1970)." (*Id.* at p. 60, fn. 9.) Defendant predicts that the United States Supreme Court will reject this principle of law. Unless and until the high court alters its position, we apply the long-standing principle reiterated in *Crawford* and therefore reject defendant's claim on the merits.

### 3. *Victim-impact evidence at the guilt phase*

Defendant contends victim-impact evidence was admitted at the guilt phase in violation of his right to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and article I, sections 7, 15, 17, and 24 of the California Constitution.

During the guilt phase, after questioning Shahbakhti concerning the circumstances of the shooting that took place in front of the Vons market, and concerning his resulting injuries and medical treatment, the prosecutor inquired: "Ha[ve] there been any lasting health problems associated with—or any psychological problems that you have as a result of this gunshot wound?" The defense objected to the question as compound. After the court overruled that objection, defense counsel stated, "Objection, relevance as to a portion of the question."[20] The court overruled that objection. Shahbakhti then responded, "I still see a psychiatrist because of post-traumatic disorder, which is anxiety, and, yes, I'm permanently disabled. I will never get the entire full function of my right arm back."

Shahbakhti's testimony that he was permanently disabled and never would regain the full function of his arm was relevant to the allegation of infliction

challenging a principle that *Crawford* merely reiterated: when the declarant is available for cross-examination at trial, the confrontation clause does not limit the use of the declarant's out-of-court statements. (*Crawford v. Washington, supra*, 541 U.S. at pp. 59–60, fn. 9.)

Finally, defendant "suggests that this Court adopt the federal practice of reviewing erroneous rulings for plain error when no objection has been made." "This court, however, has rejected the claim that the forfeiture rule does not apply in capital cases. (*People v. Benavides* (2005) 35 Cal.4th 69, 115 [24 Cal.Rptr.3d 507, 105 P.3d 1099] [rejecting a claim that we should conduct ' "plain error review," ' notwithstanding forfeiture, in capital cases]; *People v. Cain* (1995) 10 Cal.4th 1, 28 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)" (*Dykes, supra*, 46 Cal.4th at p. 757.)

[20] The People assert defendant forfeited his contention that *victim-impact evidence* should not have been admitted, because he objected only that the question called for *irrelevant evidence*. The circumstance that defendant describes the testimony as "victim impact evidence" does not alter our analysis; defendant has not cited any authority for the proposition that the admission of irrelevant victim-impact evidence constitutes an error different from the admission of any other irrelevant evidence. Thus, defendant's "relevance" objection preserved his present claim.

of great bodily injury. (§ 12022.7.) The sole aspect of this testimony that was irrelevant at the guilt phase was the statement that "I still see a psychiatrist because of post-traumatic disorder, which is anxiety . . . ." The admission of this evidence was harmless error, however, because it is not "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.)[21] As noted above, in part II.B.1., the properly admitted evidence establishing that defendant was the individual who committed the crimes at the Vons market was overwhelming. In addition, Shahbakhti's and Weidmann's descriptions of the circumstances of the shooting were undisputed. Finally, the jurors reasonably would expect that an individual who was shot and disabled, as Shahbakhti was, would experience anxiety. Thus, it is not reasonably probable that this brief reference to Shahbakhti's psychological injuries affected the verdicts or any findings made at the guilt phase.

### 4. *Rejection of an instruction on lesser included offenses*

Defendant contends the trial court should have instructed the jury concerning second degree murder and voluntary manslaughter in connection with the charge of the murder of Timothy McVeigh.

 "[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [89 Cal.Rptr.3d 225, 200 P.3d 847].) "[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. [¶] Such a risk cannot be tolerated in a case in which the defendant's life is at stake." (*Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].)

"To warrant [an instruction on a lesser included offense], there must be substantial evidence of the lesser included offense, that is, 'evidence from

---

[21] The sole authority defendant cites in support of his assertion that the admission of victim-impact evidence at the guilt phase violates his federal constitutional rights is *Payne v. Tennessee* (1991) 501 U.S. 808, 830, footnote 2 [115 L.Ed.2d 720, 111 S.Ct. 2597], which held that such evidence is admissible at the penalty phase. *Payne* does not stand for the proposition that the admission of irrelevant evidence at the guilt phase concerning the suffering of a victim denies a defendant the constitutional right to a fair trial. Defendant does not otherwise explain how this fleeting reference to Shahbakhti's continuing anxiety violated any federal constitutional right.

which a rational trier of fact could find beyond a reasonable doubt' that the defendant committed the lesser offense. [Citation.] Speculation is insufficient to require the giving of an instruction on a lesser included offense. [Citations.] In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged. [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 174 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Defendant fails to identify any evidence that would support a finding of either second degree murder or voluntary manslaughter. Instead, he relies upon the circumstance that *the prosecutor* requested instructions concerning second degree murder and voluntary manslaughter "to protect the record." When pressed by the court to explain how the jury might find these offenses, the prosecutor expressed concern that a juror might conclude that defendant did not enter the Alpha Beta market to commit a burglary, or defendant did not take any money. The trial court stated that it would not give the requested instructions, based upon its assessment of the evidence.

According to defendant, the prosecutor's statement "was not speculation—it was the opinion of the man prosecuting the case," and "[i]t was not speculation for [the prosecutor] to opine that the jury might believe that a robbery had not taken place or that if it had, it was incidental to the murder." The prosecutor's opinion, however, is not evidence, and there is no evidence in this case to support a conclusion that the individual who entered the store wearing a wig, and who quickly proceeded to a cash register and pointed a gun at the clerk, did not enter the store with a felonious intent, or a conclusion that the individual did not rob Rambo, or a conclusion that the killing of McVeigh did not occur in the course of these felonies. The only issue was whether defendant was the individual who killed McVeigh in the course of these felonies, because whoever was the perpetrator was guilty of felony murder. (§ 189.) Therefore, there was no evidence to support the giving of instructions on the lesser included offenses of second degree murder or voluntary manslaughter.

### 5. *Asserted prosecutorial misconduct*

Defendant contends numerous statements made by the prosecutor during his opening and closing arguments constituted misconduct.

 " ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial

misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " ' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 494 [61 Cal.Rptr.3d 526, 161 P.3d 58].) "To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and seek an admonition if an objection and admonition would have cured the harm." (*People v. Kennedy* (2005) 36 Cal.4th 595, 618 [31 Cal.Rptr.3d 160, 115 P.3d 472].) The objection must be made on the same ground upon which the defendant now assigns error. (*People v. Jones* (2003) 29 Cal.4th 1229, 1260 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

#### a. *Denigration of defense counsel*

When the prosecutor began his opening argument, he stated that "Nothing I say this morning or ever in this trial is meant to reflect poorly on the defense attorneys." He added that he had "to be willing to get in there and hit hard, I cannot be namby-pamby and do my job, but I won't be critical of them." He further explained that "I will be critical of defense position. I'll be critical of [defendant's] conduct, but nothing I say is meant to reflect on [defense counsel]. [¶] I want to get that straight from the start but they know, they are both big boys and they know I'll hit them hard and I expect them to hit me hard. [¶] We know these type of cases, murder cases, death penalty cases are going to be very hotly contested so I expect them to let me have it. I want them to give me their best shot. That's what makes the system work. [¶] They are here to be diligent advocates. I appreciate that and I'm here to do the same thing. No hard feelings. After this we shake hands and go on to our next cases."

Defendant did not object to the prosecutor's statements, and therefore has forfeited his challenge to these comments. His claim also fails on the merits. Defendant asserts that "[t]his argument made fun of defense counsel and denigrated their roles as advocates." "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. [Citations.]" (*Hill, supra,* 17 Cal.4th at p. 832.) Nothing in the prosecutor's comments, however, may be understood to be an attack on the integrity of counsel or to cast aspersions on counsel.

Defendant also perceives denigration in comments by the prosecutor concerning discrepancies between defense counsel's statements and the evidence. The prosecutor asserted that statements by counsel concerning the events were speculation, such speculation was intended to aid their client, and the jury should consider the source of any inferences it drew, in order to ensure that the inferences were based upon evidence rather than upon

impermissible speculation.[22] The trial court properly overruled defendant's objection to these comments. "[T]he prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. [Citations.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152] (*Bemore*).) For example, we concluded in *People v. Medina* (1995) 11 Cal.4th 694 [47 Cal.Rptr.2d 165, 906 P.2d 2] that it was unobjectionable for the prosecutor to state that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something . . . .' " (*Id.* at p. 759.) Similarly, the prosecutor's comments in the present case concerning defense counsel's speculation "[did] not amount to a personal attack on counsel's integrity. [Citations.]" (*Ibid.*) In addition, these comments focused the jury upon the evidence rather than distracting it from its task. (Cf. *Bemore, supra,* 22 Cal.4th at p. 846 [attacks on counsel "risk focusing the jury's attention on irrelevant matters . . ."].)

Defendant again perceives denigration of his counsel in the prosecutor's comments regarding defense counsel's discussion of the meaning of "beyond a reasonable doubt." The prosecutor stated, "the easy thing to do would be to read to you from the instructions, like I did. I wrote the instructions out word for word. [¶] But [defense counsel] didn't do that. He decided to create his own chart. Something from his mind. The judge is not going to give you a chart like this." Defense counsel objected and "ask[ed] that counsel be restricted to the scope of my argument and the facts and the law." The court overruled the objection. The prosecutor then commented that the chart, with a line representing the "preponderance of the evidence" standard at 51 percent and a line "twice as far up," implied that the People were required "to prove their case beyond a hundred percent."

---

[22] The prosecutor explained, "I want to show you why what the attorneys say is not evidence." He then stated that "[defense counsel] says Mr. McVeigh from his angle, what is visible from a person at that angle is not the gun held down by his right hip. He says they are twisting. Mr. McVeigh had not seen the gun. [¶] How does he know that[?] How does the defense attorney say to you that Mr. McVeigh doesn't see the gun? . . . [¶] There's no evidence that we know of where Mr. McVeigh was before the shooting, what angle he came at. Certainly Brenda Rambo had an idea he came from a particular area, but these defense attorneys are putting forth their views which is not the evidence. They want to put it in your mind that Tim McVeigh didn't see the gun because that helps their defendant but they were not there. They are speculating . . . in a manner that plants an idea in your mind that he did not see the gun." Defendant objected "on the grounds of misconduct. He's addressing attorney's conduct and not the facts or the law." The court responded that it would overrule the objection at that time. The prosecutor then added, "My concern is you're going to be back in the jury room and somebody is going to say somebody during the trial said he did not see the gun. All I ask you to consider is . . . the source of the information. I'm not faulting [defense counsel]. They could pull things out of the transcript and say I did the same thing. [¶] I'm saying when either of us speak—I'm not picking on him because he could do the same thing with me and I invite him to do so if he wants, but all I'm suggesting is consider the source, did you hear it from the attorneys or did you hear it from the witness stand."

Even if we assume counsel's objection encompassed the claim now asserted by defendant, we find this claim lacking in merit. The prosecutor's comments fell well within the latitude allowed in commenting upon deficiencies in opposing counsel's tactics. (See *Bemore, supra,* 22 Cal.4th at p. 846; see also *People v. Taylor* (2001) 26 Cal.4th 1155, 1166–1167 [113 Cal.Rptr.2d 827, 34 P.3d 937] [prosecutor's references to defense "tricks" or "moves" was not misconduct].) There was nothing deceptive or reprehensible in the prosecutor's comments; rather, they reflected an attempt to clarify the People's burden of proof.

After referencing Officer King's testimony concerning her efforts to locate defendant and his vehicle at his apartment immediately after the shooting at Vons market, the prosecutor noted that defense counsel had asked King about how "tough" it was to be a police officer, and whether she was afraid when she was in her patrol car alone. The prosecutor then stated, "Why was he asking those questions? Does anybody have any idea? What does that have to do with whether or not his client committed attempted murder that night. What was that about? What is the purpose of patronizing her. Why are you sitting there—." The defense "object[ed] to that remark as being improper, patronizing an officer." The court overruled the objection, and the prosecutor stated, "Well, call it what you like. If that offends [defense counsel], I'm sorry, I take it back. What is the point of those questions." Again, these statements fell well within the latitude allowed for comment upon deficiencies in opposing counsel's tactics. (See *Bemore, supra,* 22 Cal.4th at p. 846.) In addition, in context, the prosecutor's comments were intended to persuade the jury to reject any implication that King's testimony should be discounted because of emotions she might have felt while being placed in a dangerous situation, and there is no reasonable likelihood that jurors would view the remark as a personal attack on counsel. (See *People v. Young* (2005) 34 Cal.4th 1149, 1192 [24 Cal.Rptr.3d 112, 105 P.3d 487] [a review of the entire argument persuaded the court that the prosecutor's comments describing defense counsel's discussion of the law as "unintelligible gibberish" and "garbage" were not misconduct; the prosecutor "was merely determined to correct" defense counsel's erroneous description of the law, and "[t]here [was] no reasonable likelihood that the jury would interpret this remark as a personal attack on the integrity of counsel"].)

In reviewing the testimony of Paul Diersing, the prosecutor stated that defense counsel had asked Diersing "the question that I found very curious. He asked him, well, is it company policy to just give [a robber] what he wants. [¶] And I started thinking about that because it bothered me that he asked that question and I guess the inference to that question is somehow Mr. McVeigh got what he deserved for trying to help his friend." Defendant objected; the court overruled the objection, and defendant requested a sidebar conference. At that conference, defense counsel asserted that the prosecutor

exceeded the latitude allowable in permissible argument "when he attributes comments to [defense counsel], some attempt to blame a victim." Defense counsel acknowledged that the prosecutor was "entitled to argue that such an inference would be false and misplaced. . . . But it's his reference to the state of mind of the attorneys that's inappropriate." The prosecutor responded, "I don't think I said it that way, but the question which was asked of the witness by the defense is was he following company policy. I don't know what was the relevance of that question, what the purpose of the question was other than Mr. McVeigh did something wrong and got shot because of it."

The court responded that defense "counsel's concerns are well taken," and suggested that the prosecutor "refrain from doing that." The court also stated that it would not admonish the jury "at this stage," but would consider doing so "at the conclusion of all the arguments." Nonetheless, immediately following the sidebar conference, the court explained to the jury that the court gave wide latitude to counsel, but the jury should focus upon the evidence and the law, and "the conduct and thoughts of counsel is not something for you to be looking at and focusing on." Following these comments, the prosecutor stated: "I'm not criticizing [defense counsel]. It's the evidence they are eliciting, the question which was asked of that witness Mr. Diersing[,] was he following company policy. [¶] Well, that question, what is that to lead us to believe, that somehow Timothy McVeigh did something wrong, and because he did something wrong he was killed. That is ludicrous."

Not only did the court admonish the jury immediately following the sidebar conference, it also addressed this point at the conclusion of the prosecutor's opening argument, stating that "[t]he district attorney is allowed to comment on the questions of witnesses that have testified before you and those questions were put to the witness by counsel for defendant. He's entitled to comment on those answers. I think that was the thrust of his comments. [¶] However, I have to be careful to caution you that the thought processes of the attorneys, whatever those are, the intent of the attorneys, I don't want you speculating about that. That's just something that is not within the ambit of the evidence for your consideration." In addition, in his argument, defense counsel explained what he believed to be the relevance of Alpha Beta's policy that employees comply with a robber's demands and thereby enhance the safety of employees. Counsel stated: "Did [McVeigh] run up and grab a gunman, seeing a gun? No, that's not what happened. He's been trained, he knows the store policy. If he'd seen the gun, he wouldn't have done that. That's what this testimony was about."

There is no merit in defendant's claim that the prosecutor's comments concerning the question posed to Diersing had the effect of denigrating counsel. The prosecutor's comments focused upon the inference to be drawn

from the question, not upon defense counsel's state of mind or intent. A prosecutor is not prohibited from challenging an inference raised by a question merely because defense counsel thereby may be cast in a poor light for having posed the question. The prosecutor's statement that "it bothered me that he asked that question" did not add anything to the prosecutor's commentary upon the evidence that was not implicit in his observation that defense counsel's question seemed to raise an unfair inference.[23] In addition, even if a juror initially might have construed the comments as critical of defense counsel, the court's admonitions clarified that the prosecutor's statements were relevant only as commentary upon the evidence, and that the jurors were not to speculate concerning counsel's thought process or intentions. (See *People v. Friend* (2009) 47 Cal.4th 1, 31 [97 Cal.Rptr.3d 1, 211 P.3d 520] (*Friend*) [the court's admonitions "insured that the jury understood that [the prosecutor's] comments were irrelevant to its consideration of the case"].)

### b. *Shifting the burden of proof*

At various times, the prosecutor expressed confusion and lack of understanding concerning the nature of the defense. Based upon these comments, defendant claims the prosecutor's statements shifted the burden of proof to the defendant. As noted above, in part II.B.1., the prosecutor observed during his opening argument that in defendant's opening statement, defense counsel had avoided stating who had committed the charged crimes, but had referred to defendant twice by name when discussing the incident at the Vons market. The prosecutor then stated, "So I don't know what the defense is in this case. I don't know if they are saying now it's [defendant,] now that all this evidence has come in[,] or if they are still saying it's some robber, we don't know who it is, but there's some other interesting things he talked about in his opening statement. I want to point it out to you to show how the defense tenor has changed during the point of this trial." Defense counsel then objected, "This is not a comment on the facts or the law." The court overruled the objection.

Similarly, after reviewing the evidence, the prosecutor stated: "So I think the defense is going to say he didn't do it. I don't know. I'll have to wait. I do not know what the defense is to this case yet. I'm waiting to hear." Defendant did not object.

---

[23] Defendant relies upon *People v. Pitts* (1990) 223 Cal.App.3d 606 [273 Cal.Rptr. 757], which states that a prosecutor may not portray defense counsel as a villain who is attacking the victim. (*Id.* at p. 704.) In *Pitts*, the prosecutor's statements "in essence accused defense counsel of contributing to the ruination of [a witness's] life," and "reasonably [could] be interpreted as a subtle accusation that defense counsel knowingly presented perjured testimony." (*Id.* at p. 705.) In contrast, the prosecutor's comments in the present case did not attack defense counsel in any such manner.

When the prosecutor began to discuss the witnesses' identification of defendant, the prosecutor stated: "Now just a couple things about identification because I don't know what the defense is going to say when they get up here. I don't know if they are going to concede [defendant] committed these crimes or not, but you'll be given an instruction on how to consider eyewitness testimony." Defendant did not object.

As he reached the end of his opening argument, the prosecutor told the jurors that he wanted to talk about the defense. He stated: "I have a blank paper because I'm not sure exactly what the defense is yet. I'm going to sit here like you and listen to [defense counsel]. I don't know what he's going to say." The prosecutor then identified a number of questions he would be waiting to hear answered by defense counsel—Did defendant rob Bugbee? Did defendant fire a handgun at Weidmann and Shahbakhti? Why did defendant leave his apartment on May 31, 1994, with the door open, and the lights on? Why did defendant possess a .380-caliber handgun and ammunition, sunglasses, a purple hooded sweatshirt, laser sights, and wigs? Was defendant "guilty of special circumstance murder of Timothy McVeigh[?]" Defendant did not object.

Following these comments, both the prosecutor and the trial court reminded the jury that the burden of proof rested upon the prosecution. The prosecutor ended his opening argument by stating he would take notes as defense counsel spoke, "and because I have the burden of proof I do get to rebut what he says. [¶] I don't get to argue everything all over, but I can rebut the points he brings up because it's my burden to prove that this defendant committed these crimes . . . ." The court then advised the jury of various principles. As is relevant here, the court stated: "There's certain legal requirements that go with these types of proceedings and the burden of proof is on the People, or on the State. The defendant has no burden of proof in the criminal trial—you'll see it again in the instructions, and again I want to be careful that you not misunderstand the comments that were being made this morning, and I'm not saying they had any intent other than that. [¶] The evidence can be commented on and the law can be commented on, but I thought just at the end the district attorney said the burden of proof is on the People, and that's true. I want to make sure there's no misunderstanding about that."

In his closing argument, the prosecutor returned to the theme of "waiting to hear what the defense was," and attacked defense counsel's argument. He then stated to the jury: "I am very concerned, representing the State, that one of you has missed the focus of this trial. And that is a nightmare to me. That one of the [jurors] that I'm looking at just doesn't get it." He further stated that "I lie awake at night worrying that you people will not get it. It is not

about what color his shoes were, what color his wig was, what hand he held the gun in, whether Brenda Rambo was emotional. Does that change whether he killed Timothy McVeigh? Does it matter that he's five-eight or six-two? Of course not." Defendant did not object to these statements.

Defendant failed to object to any of these comments on the ground they shifted the burden of proof to defendant. Therefore, he has forfeited this claim. The claim also fails on the merits, because the comments did not indicate that defendant bore the burden of proof. In the circumstances of this case, in which there was overwhelming and seemingly irrefutable evidence that defendant committed the crimes charged, the prosecutor's comments merely highlighted his observation that there seemed to be no coherent defense to the charges. Finally, had any juror interpreted the comments to indicate that defendant had a burden of proof, this impression would have been dispelled by the instructions and the numerous reminders to the jurors that the People bore the burden of proving defendant's guilt. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [65 Cal.Rptr.2d 145, 939 P.2d 259] [the court, noting that the prosecutor had reiterated that the prosecution had the burden of proof, observed that "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence"].)

### c. *Vouching for the credibility of witnesses*

Defendant claims the prosecutor vouched for the credibility of Joseph Loya, who followed defendant's vehicle after the Vons market shooting, Officer King, who attempted to locate defendant at his apartment after that shooting, and Officer Jansing, who arrested defendant in San Francisco. "A prosecutor may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' [Citation.] But a 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 432–433 [20 Cal.Rptr.3d 182, 99 P.3d 505].)

When the prosecutor began to discuss the testimony of Loya, he referred to him as "a nice young man who did something very important in this case. [¶] . . . [¶] Joseph Loya deserves our thanks. He went to the trouble of chasing after somebody he felt did something wrong." After reviewing Loya's actions and his role in identifying defendant, the prosecutor stated: "So these are the kinds of people we presented to you as witnesses. This is the kind of young man that you saw here who was willing to put himself out to do what

he felt is right. That is the nature and quality of these witnesses." Defendant did not object to these comments.

After the exchange noted above, in which the prosecutor questioned the defense's purpose in "patronizing" Linda King by asking her questions about how she felt as a police officer alone in her patrol vehicle, the prosecutor stated: "Here is a police woman doing her job. She's willing to put herself on the line. She knows she's there to look for[] somebody who has just committed attempted murder. She's sitting there in the dark on her own willing to sacrifice, to be there to catch people like him. [¶] I don't know what the point was of those questions about her being scared. She was there because she believes in what she does. She's a police officer. She did what she was supposed to do." Other than his objection to the prosecutor's comment concerning the defense's "patronizing" the witness, noted above, defendant did not object to these statements.

With respect to Officer Jansing, the prosecutor stated: "I wanted you to see the quality of him. I brought him down from San Francisco. I wanted you to see this is a man who is doing his job. Here's a guy—you saw the kind of man he is. Attention to detail. [¶] He didn't have to run that plate. Something didn't look right and fortunately there are people like Officer Jansing who take their job seriously in life. [¶] It could have been easy for him in the middle of his shift to drive by a parked car and not think anything of it. A guy like this and a guy like Mr. Loya are to be given credit. They went the extra distance. To run a plate he didn't have to do and did everything by the book. Fortunately for us and fortunately for law enforcement there are people like Mr. Jansing who are willing to do their jobs properly and that is how this man got captured." Defendant did not object.

At the end of his closing argument, the prosecutor stated: "I am confident you will have no problem in quickly resolving this case because there is no defense. It is indefensible what he did. He just happened to get caught. Thank you Mr. Loya, thank you Officer Jansing. [¶] That is why we're here. He almost got away with it except for people like that who are willing to go the extra distance." Defendant did not object.

Because the defense did not object that the prosecutor was vouching for the witnesses' credibility, defendant has forfeited this contention. His claim also fails on the merits, because the prosecutor's comments concerning these witnesses were based upon facts established by the testimony and did not refer to evidence outside the record. The prosecutor's remarks did not improperly vouch for the credibility of these witnesses.

#### d. *Asking the jury to conduct an experiment*

The prosecutor stated that "[y]ou're going to be asked by both sides to look at the weapon. [¶] I invite you to look at the trigger pull. You can look at it on single action and double action. It is a significant pull to get the trigger to pull. I want you to put the safety on. You'll see when you put on that safety it's impossible to get that gun to fire." Not only did defendant fail to object to these comments, but he earlier agreed that the jurors should be permitted to inspect the weapon in order to allow them to appreciate its mechanical operation.[24] Therefore, he has forfeited any claim regarding these comments.

This claim also fails on the merits. " 'A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters.' . . . A juror commits misconduct if the juror . . . engages in an experiment that produces new evidence [citation]." (*People v. Wilson* (2008) 44 Cal.4th 758, 829 [80 Cal.Rptr.3d 211, 187 P.3d 1041], citations omitted.) The prosecutor's invitation that the jurors examine the firearm was a request that they consider the evidence presented at trial, not that they produce new evidence through an experiment. Thus, there was no impropriety in his remarks.

#### e. *Appealing to the jurors' passion or prejudice*

Defendant claims that various statements by the prosecutor were intended to appeal to the jurors' passion or prejudice. "It is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 956–957 [47 Cal.Rptr.2d 426, 906 P.2d 388],

---

[24] Before Dennis Fuller testified concerning the firearm, the court and the parties discussed the conditions under which the jury should examine the weapon. Defense counsel stated that "we're going to need them to assess the trigger pull. That's something I want them to do. I want the jurors to understand both actions, and it's certainly relevant in terms of several of the themes in the case both now and if we get to a penalty phase." The court stated, "if both of you feel that the jury should be aware of the mechanics of the weapon, I will permit testimony about it and also let the jurors see the weapon back in the jury room. . . . If you want the jurors out here in open court to go through touching the weapon, I can do that also. What's your preference?" Defense counsel responded, "I'm not so concerned about when they do it as long as they have the opportunity to both see how the firearm works and get a physical idea of what the trigger pull is like. Whether that's here or in the jury room doesn't matter to me as long as the court's satisfied with the safety." Following further discussion, defense counsel added: "Just so we don't slow down the proceedings. I know that handling the weapon for many people will be very distracting so I would suggest the jurors themselves not handle it today but upon request it would be available for them later on in the jury room."

overruled on other grounds in *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) Defendant did not object to any of the prosecutor's statements on this basis, and therefore has forfeited this claim. As explained below, the claim also fails on the merits.

The first challenged comments were made when the prosecutor argued that the evidence of defendant's guilt was overwhelming, and "the defense wants you just to look at the things that will walk [defendant] out of here . . . ." As noted above, the prosecutor expressed concern that one of the jurors would not understand the relevant facts. "I am very concerned, representing the State, that one of you has missed the focus of this trial. And that is a nightmare to me. That one of the [jurors] that I'm looking at *just doesn't get it.* I know *most of you have common sense.* . . . [¶] If this man went to Alpha Beta with the intent to rob and do a burglary, he is guilty of special-circumstance murder. [¶] I lie awake at night worrying that *you people will not get it.* It is not about what color his shoes were, what color his wig was, what hand he held the gun in, whether Brenda Rambo was emotional. Does that change whether he killed Timothy McVeigh? Does it matter that he's five-eight or six-two? Of course not." (Italics added.)

Defendant asserts the italicized comments "engaged the personal pride of the jurors," "injected into the case broader issues than [defendant's] guilt[,] and invited the jury to render a verdict based upon their personal pride or public opinion." Viewed in context, however, the statements merely empha-sized the prosecutor's argument that the evidence of guilt was overwhelming, and that jurors should not become distracted by irrelevant circumstances or arguments. The prosecutor's arguments focused the jury on its role, did not invite an irrational or emotional response, and did not refer to public opinion. The cases cited by defendant do not support a contrary conclusion.[25]

---

[25] Defendant cites *People v. Morales* (1992) 5 Cal.App.4th 917 [7 Cal.Rptr.2d 358], in which the prosecutor told jurors to imagine how they would explain to their spouses or significant others that they let the defendant go, and asserted the reaction would be, "What were you thinking of?" The court acknowledged that a prosecutor may not suggest that jurors consider public opinion in deciding guilt, but concluded the defendant had forfeited the claim by failing to object. (*Id.* at p. 928.) In *U.S. v. Polizzi* (9th Cir. 1986) 801 F.2d 1543, the prosecutor urged the jury to join the war on crime. "Although improper (for telling the jury it had any obligation other than weighing the evidence), whatever prejudice flowed from this statement was adequately cured when the court later instructed the jury that its function was 'to determine the guilt or innocence of the accused from the evidence in this case' and that the 'statements and argument of counsel are not evidence.' " (*Id.* at p. 1558.) In *U.S. v. Monaghan* (D.C. Cir. 1984) 239 U.S. App.D.C. 275 [741 F.2d 1434], the court acknowledged that "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. . . . [¶] But a request that the

The second challenged comment was made in response to an inconsistency in the defense's argument—the defense continued to question the witnesses' identification of defendant as the perpetrator of these crimes, but also focused upon mitigating evidence, such as the circumstance that the perpetrator did not shoot Rambo. The prosecutor commented, "They can't tell you on the one hand, . . . some gunman robbed Alpha Beta and Brenda Rambo, yet the defendant is a nice guy for not shooting Brenda Rambo. . . . [¶] . . . [¶] . . . After he shot her friend in cold blood, he's a good guy now? [¶] Maybe it's me. Maybe my priorities are screwed up, I don't know. *Maybe you think he is a nice guy.*" (Italics added.) The prosecutor then noted that the robbery of the Alpha Beta market occurred six weeks after the shooting of Shahbakhti, "and they want you to think he's kind, not coldly calculating?" Defense counsel then "object[ed] to this argument. It is beyond the scope, and it is not in response to anything I said." The court overruled the objection.

Defendant asserts the italicized comment engaged the jurors' personal pride. Viewed in context, the comment is merely a criticism of the suggestion that defendant's decision not to shoot Brenda Rambo should be considered in resolving the issues presented. The comment did not invite an irrational or emotional response from the jury.

Finally, the prosecutor stated: "If twelve people from this community, after hearing all this evidence, finding the wigs, the murder weapon, the bullets in his house, *if you cannot reach a decision on this, we are in sad shape.* [¶] So that's what I'm asking you to do. The success of this system depends on people such as you to work together back there. . . . Don't get in there and express an emphatic opinion. Keep open. You have to work together. This is a deliberation process." (Italics added.)

Defendant does not explain how the italicized comment improperly appealed to the jury. Therefore, we need not consider this challenge. (See *People v. Catlin* (2001) 26 Cal.4th 81, 133 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*) [because defendant "fails to offer any authority or argument in support of [his] claim, . . . it is not considered here"]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [74 Cal.Rptr.2d 121, 954 P.2d 384] (*Barnett*) [because defendant "fails . . . to support that claim with adequate argument[, w]e . . . reject it as not properly raised"].) The claim also fails on the merits. The statement emphasized the strength of the prosecution's case and did not invite an irrational or emotional response from the jury.

jury 'condemn' an accused for engaging in illegal activity is not constitutionally infirm, so long as it is not calculated to excite prejudice or passion." (*Id.* at pp. 1441–1442, fns. omitted.)

### f. *Futility of objections*

Defendant asserts that "[d]efense counsel objected to the vast majority of the instances of misconduct" and that additional objections would have been futile. "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (*Hill, supra*, 17 Cal.4th at pp. 820–821.)

As is reflected in our review of the contentions raised concerning the prosecutor's argument at the guilt phase, defendant objected to only six of the 18 instances of claimed misconduct. In addition, other than the objections related to his claim that certain comments denigrated defense counsel, none of the objections was voiced on the basis upon which he now relies. Finally, with respect to the claimed denigration of defense counsel, the trial court admonished the jury that the conduct and thought processes of counsel were not relevant to the jury's task. We find no support for the assertion that it would have been futile to interpose objections and request that the jury be admonished.

### 6. *Cumulative error*

Defendant contends that the various claimed errors, considered together, "resulted in convictions which are constitutionally unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal constitution." The only errors we have found are (1) the premature admission of evidence concerning out-of-court identifications (that is, before the witness testified that he or she had made the identification and that it was a true reflection of his or her opinion at that time), and (2) the admission of evidence that Shahbakhti suffered anxiety as a result of being shot. These two errors, considered together, did not result in constitutionally unreliable verdicts or findings.

## C. *Penalty phase*

### 1. *Admission of victim-impact evidence concerning Shahbakhti*

As noted above, Shahbakhti testified at the guilt phase concerning the anxiety he suffered as a result of being shot by defendant. We concluded the

testimony was irrelevant at that phase of the trial, but harmless. Defendant contends this evidence also was irrelevant at the penalty phase, because it did not relate directly to the capital offense. We disagree. At the penalty phase, this testimony was admissible under section 190.3, factor (b), as "evidence of the emotional effect of defendant's prior violent criminal acts." (*People v. Price* (1991) 1 Cal.4th 324, 479 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see *People v. Davis* (2009) 46 Cal.4th 539, 617–618 [94 Cal.Rptr.3d 322, 208 P.3d 78].)

### 2. *Asserted prosecutorial misconduct*

Defendant claims the prosecutor committed misconduct in the course of cross-examining defense expert witnesses and during his argument. As noted above, in evaluating this claim we consider whether the prosecutor used deceptive or reprehensible methods to persuade the jury. In addition, as noted, a defendant must object and request an admonition in order to preserve a claim of prosecutorial misconduct, and the objection must be made upon the same ground as that which the defendant assigns as error on appeal.

#### a. *Cross-examination of defense experts*

Defendant contends that during the prosecution's cross-examination of Norman Morein and Michael Mantell, the prosecutor improperly elicited evidence of defendant's future dangerousness. He also contends the prosecutor denigrated Mantell. As explained below, these contentions find no support in the record.

Norman Morein testified that, based upon his review of prison records related to defendant's incarceration during the years 1983 to 1993, in Morein's opinion defendant would adjust very well to prison. During redirect examination, defense counsel asked Morein whether a probation report prepared at the time a defendant is convicted and sentenced is important in determining the prisoner's classification within the prison. Morein responded, "Only the offense is the important thing." The prosecutor began his recross-examination by pursuing this topic, asking Morein to identify the offenses for which defendant was sentenced to prison in 1983. Morein identified attempted murder and robbery, but was uncertain of the number of counts. The prosecutor then inquired whether the number of offenses was important in classifying a prisoner. The defense objected that the question was irrelevant to Morein's testimony. The objection was sustained. The prosecutor then asked Morein to confirm he was "here giving an opinion [concerning] somebody's adjustment." Morein agreed. The prosecutor followed up by asking, "And would you not agree with me that you need to look at the person's past in order to determine what type of risk they might be in the

future?" Morein responded, "That's true." The prosecutor then asked whether Morein was aware when he was reviewing defendant's prison records that defendant had attempted to kill three police officers (referring to defendant's conduct during the police chase in 1982). Morein confirmed he was aware of that fact. The prosecutor then asked, "How did that factor into your opinion in this case?" Morein responded, "It didn't." At this point, defense counsel objected that "it's not relevant as to his opinion as to adjustment in prison. If it's classification, it's another question." The court overruled the objection, and Morein testified that the prison sentence rather than the nature of the crime was the factor that determined where a prisoner was assigned.

■■■■ Defendant asserts the prosecutor improperly introduced evidence of future dangerousness during this exchange. (See *People v. Avila* (2006) 38 Cal.4th 491, 610 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [" '[E]xpert testimony that a capital defendant will pose a danger in the future if his life is spared is inadmissible.' [Citation.] A prosecutor can, however, 'properly explore on cross-examination the basis for an expert's prediction that a capital defendant will pose no future danger if sentenced to life without parole.' "].) Defendant did not object that the prosecutor was seeking or eliciting evidence of future dangerousness, and therefore has forfeited this claim. The claim also fails on the merits, because the questions did not elicit testimony that defendant would pose a danger in the future.

Defendant's challenge to the prosecutor's treatment of Mantell focuses upon questions concerning defendant's deteriorating performance during the time he served as a Los Angeles County Sheriff's deputy. During cross-examination, the prosecutor asked, "There are a number of reports that you saw that were very critical of [defendant's] behavior that you talked about, true?" The witness responded, "That's correct. It came later. Not at [the] Firestone [Station], necessarily." The prosecutor then stated, "My question—I don't want to stand and argue with you." Defendant then objected that "[t]he question was so broad it was responsive." The court interjected, "Hold on. I think we're doing very well. We just need to continue." The prosecutor then stated: "If you can, doctor, can you listen to my question and we'll get to it all. [¶] Now, did you in fact see a number of documents which were critical of this man's performance as a [sheriff's deputy]?" The witness answered, "Yes, I did." The prosecutor then asked, "Now, in the beginning when he was [assigned to] the jail and Firestone [Station] things appeared to be fine; is that correct?" The witness responded, "That's true."

■■■■ Defendant asserts on appeal that the questions were argumentative, but he did not object on that basis below. Accordingly, this claim is forfeited. The claim also fails on the merits. "An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit

relevant testimony." (*People v. Chatman* (2006) 38 Cal.4th 344, 384 [42 Cal.Rptr.3d 621, 133 P.3d 534].) In the exchange set forth above, the prosecutor's questions were directed toward obtaining confirmation of relevant facts, and were not a speech to the jury. The circumstance that the prosecutor confronted the witness, challenged the witness's responses, or attempted to control nonresponsive testimony does not render the prosecutor's questions "argumentative." Other than citing the questions and responses set forth above, defendant merely notes that the trial court sustained his objections that other questions were argumentative. Finally, defendant's contention that the questions were argumentative seems to be made in support of his claim that the prosecutor denigrated defense experts and introduced evidence of future dangerousness, but defendant does not explain how the prosecutor's questions to Mantell support that claim. Absent an explanation, we need not consider this claim on appeal. (See *Catlin, supra,* 26 Cal.4th at p. 133; *Barnett, supra,* 17 Cal.4th at p. 1182.) This claim also fails on the merits, because the questions concerning defendant's performance as a sheriff's deputy, and counsel's efforts to focus Mantell's responses, did not denigrate the witness or elicit testimony concerning future dangerousness.

### b. *Argument*

Defendant sets forth 12 statements made by the prosecutor during argument, and then recites various general principles concerning prosecutorial misconduct. To the extent we can discern his claims of error, we find them to be without merit.

First, in the course of his argument, the prosecutor recalled various flippant remarks defendant had made during the commission of several crimes, and asserted that these comments disproved the defense theory that defendant acted out of stress or trauma. He further commented that "[i]f you were to look at the defense witnesses, you would think all police officers just retire because of stress," and stated that "[t]here are . . . thousands and thousands of people, who complete their jobs as law enforcement officers and don't go out and start killing people. [¶] That is how ridiculous the defense is. They want you to believe that because he was in the Firestone District for two years and saw a person in a car fire, that that somehow—in some shape or form made him start to go out and shoot people and commit robberies. It's preposterous. [¶] Folks, there are police officers, dedicated professionals, throughout this entire country working tough jobs. Not just in Firestone [Station], but in Newark, New Jersey, in Harlem, in the Bronx, in Detroit, areas that are . . . even tougher than Los Angeles." At this point, defense counsel stated, "We need to see you at the bench again, please." The court responded, "No, I'll sustain the objection as to the last comments." Defense counsel requested that the jurors be instructed to disregard the comments. The court responded, "Please. [¶] Let's proceed."

Defendant asserts that the references to the defense as "ridiculous" and "preposterous" denigrated counsel. Defendant did not object to these specific statements, and therefore forfeited this claim. Even if his subsequent objection is construed to refer to these comments,[26] however, this claim fails on the merits. "It is, of course, improper for the prosecutor 'to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case. . . . Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 212 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) The prosecutor's remarks, however, attacked the defense theory, not defense counsel's integrity, and did not constitute denigration of counsel.

Second, defendant complains that the prosecutor stated that "[defendant] thinks he's smarter than everybody else. [¶] And he is. He is of superior intelligence. That's why I wanted to bring out to you his IQ. He is smarter than probably 95 percent of the people on the planet." Defendant objected that there was no evidence to support the statement. The court responded, "I'll let that comment go and let counsel proceed." The prosecutor then stated, "I brought out testimony that his IQ was 123 and he was of superior intellect. Superior intellect. You decide what that means. That is a very high IQ. You got to be smart to be able to bust out of a prison cell." Defendant asserts this argument has no foundation in the record, and he notes that it is misconduct for a prosecutor to misstate the facts. (See *People v. Boyette* (2002) 29 Cal.4th 381, 435 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The argument that defendant is of superior intelligence is, however, supported by Norman Morein's testimony that defendant has an IQ of 123, which is "in the superior range." The assertion that "[h]e is smarter than probably 95 percent of the people on the planet" is an inference the prosecutor drew from the evidence that would have been obvious to any juror when the prosecutor responded to defendant's objection by referring to the evidence of defendant's IQ and stating, "[y]ou decide what that means."

Third, in the course of discussing the actions taken by defendant to evade law enforcement officers after a prior bank robbery, the prosecutor stated that defendant was willing to shoot at police officers, but when they returned fire, defendant "puts his hands out, waves them. He wants no more." The prosecutor added, "Everything is okay with [defendant] when he's the one

---

[26] In light of the circumstances that (1) the only prior objection had been that certain comments exceeded the scope of what constitutes an aggravating factor, and (2) this objection followed statements about the service of police officers in other areas of the country, it appears the objection and the court's response related to the irrelevancy of the prosecutor's tangential remarks concerning dedicated professionals working in areas "tougher than" than Los Angeles.

doing the shooting," but when he was at risk, he did not want to be killed. "It shows you the kind of man he is. That is an aggravating factor. When his life is on the line, he doesn't like it." Defendant objected that the evidence and argument were improper with respect to section 190.3, factor (b), which relates to criminal activity involving the use of force. The court sustained the objection "as to the characterization of the defendant under factor (b) and ask[ed] the jury to disregard that." Defendant asserts the prosecutor's comment that, when defendant's life was on the line, "he doesn't like it," appealed to the passions of the jury and asserted facts that were not in evidence. He did not object on this basis in the trial court, and therefore has forfeited this claim. In addition, he offers no convincing reason why the court's sustaining of the objection to the prosecutor's fleeting comment and admonition to the jury were inadequate to cure any error. (See *Friend, supra*, 47 Cal.4th at p. 31 [the court's admonitions "insured that the jury understood that [the prosecutor's] comments were irrelevant to its consideration of the case"].)

 Fourth, the prosecutor stated that "it seemed to me [that Michael Redd, defendant's son,] tried to exaggerate to make things sound a little better than they really were." The prosecutor then mentioned various facts to which the son testified, and stated it was improbable that the witness remembered events from a very young age, or that the witness could read at two years of age. The prosecutor also stated that "[h]e told us his father worked in a mall in Willits. While the other children said no, they don't remember him working at all."[27] After defendant objected on the ground that the prosecutor's remark "misstates the evidence," the court sustained the objection. Defendant claims the prosecutor "belittled the mitigation testimony, saying that Michael Redd exaggerated his testimony." Defendant did not object to the prosecutor's statement that Michael Redd had exaggerated. Therefore, he has forfeited his claim. The claim also fails on the merits. "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180 [14 Cal.Rptr.2d 342, 841 P.2d 862].) The prosecutor's statements reflected facts and inferences from the record, and did not constitute misconduct. (See *ibid.* ["Referring to testimony as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on the evidence and not on the prosecutor's personal belief."].)

---

[27] Michael Redd testified that defendant "got a job working on a mall [in Willits], but the funding for the mall ran out and they stopped the project." Sean Redd testified that defendant did not work in Willits, and specifically that defendant did not work "in a mall." Melissa Redd testified that defendant was unable to find work in Willits. When subsequently asked whether she could recall whether defendant found "any particular job up there," she responded, "No, I was too young. I can't recall."

Fifth, the prosecutor noted Richard Lum's testimony that he saw defendant at a recycling center in San Francisco in August 1994 and thereafter. The prosecutor stated he did not dispute that testimony, "[b]ut [Lum] got caught exaggerating and stretching the truth." When defendant objected on the ground that this "misstates the testimony," the court sustained the objection. Defendant notes only that the prosecutor accused Lum of exaggerating, and does not set forth any argument as to why this accusation constituted prosecutorial misconduct. Therefore, we need not consider the propriety of this comment. (See *Catlin, supra,* 26 Cal.4th at p. 133; *Barnett, supra,* 17 Cal.4th at p. 1182.) Moreover, defendant offers no reason why the trial court's sustaining of the objection did not cure any error, or why an admonition would not have cured any lingering confusion.

Sixth, with respect to the former sheriff's deputies who testified concerning the Firestone Station, the prosecutor observed: "And do you remember, it's something interesting, did you notice that all three of the witnesses, the former [deputies], that knew Mr. Redd, they all used the exact same words, they all said it was like a war zone?" When defendant objected that this argument "misstates the testimony," the court sustained the objection. In his opening brief, defendant states that the prosecutor "noted that all of the ex-police witnesses had said that Firestone was like a war zone. A defense objection was sustained." In defendant's reply brief, he recites as an instance of misconduct "[a]rguing that Firestone was like a war zone, to which an objection was sustained." He does not otherwise address the prosecutor's statement. Assuming defendant's complaint is that the prosecutor misstated the record (one of the three ex-deputies referred to a "war zone," one referred to a "combat zone," and the third did not make any substantially similar comparison), defendant offers no reason why the trial court's sustaining of the objection did not cure any error, or why an admonition would not have cured any lingering confusion.

Seventh, the prosecutor stated: "Dr. Klein was paid $1500 per day, and he talked about the hypothetical police officer. [¶] Now, I am not here to try hypothetical police officers. I'm here to try [defendant] . . . . So it is very difficult to ask direct questions about hypothetical people who don't exist. But that is the way the defense chose to present evidence of hypothetical police officers. So that I couldn't confront him about [defendant], so I could only confront him about hypothetical police officers." The prosecutor added, "That is what they give you as mitigating evidence. Hypothetical police officers." He then complained that Dr. Klein had based his opinions upon reports and had never spoken with defendant. Defendant objected that the prosecutor misstated the evidence, and during a sidebar conference added that "the tenor of the argument now is an attack on the defense, that we're somehow being duplicitous, doing what we did in the way we did it. [¶] And he should be admonished and that shouldn't be allowed to continue." The

court responded, "I am concerned that it could be construed as bad faith on the part of counsel. So I think you have to be careful about that. And so let's go." When the prosecutor resumed his argument, he stated that he may have been incorrect in remarking that Dr. Klein had reviewed reports, and that defense counsel was correct.

■■■ Reciting these facts, defendant asserts that the prosecutor denigrated this witness. But defendant did not object on this basis, nor did he request that the jury be instructed; rather, he asked the court to admonish the prosecutor, which the court did. Therefore, defendant has forfeited this claim. In addition, he does not explain how the prosecutor's statements constituted denigration of the witness. Absent such an explanation, we need not consider this claim on appeal. (See *Catlin, supra,* 26 Cal.4th at p. 133; *Barnett, supra,* 17 Cal.4th at p. 1182.) Finally, this claim fails on the merits. "Prosecutors are allowed 'wide latitude in penalty phase argument, so long as the beliefs they express are based on the evidence presented.' [Citations.] Although prosecutorial arguments may not denigrate opposing *counsel's* integrity, 'harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. [Citations.]' [Citations.]" (*People v. Parson* (2008) 44 Cal.4th 332, 360 [79 Cal.Rptr.3d 269, 187 P.3d 1].) Here, although the prosecutor misstated the basis of the expert's opinion, he corrected himself, and we find no impropriety in the remainder of the prosecutor's comments.

Eighth, the prosecutor stated that Dr. Klein "was the first witness that we heard about the anniversary-reaction defense."[28] Defendant objected "to the last word counsel used. We have not heard any testimony as to an anniversary-reaction defense." The court sustained the objection, and the prosecutor then stated, "whatever he called it, this anniversary-reaction syndrome, anniversary-reaction—whatever word you want to use." Defendant sets forth no argument as to how these statements constituted prosecutorial misconduct. Therefore, we need not consider his contention. (See *Catlin, supra,* 26 Cal.4th at p. 133; *Barnett, supra,* 17 Cal.4th at p. 1182.) In addition, defendant did not request that the jury be admonished. Therefore, he has forfeited this claim. Finally, the prosecutor's characterization of testimony concerning how an individual might behave on the anniversary of a stressful event as a "defense" does not constitute misconduct.

■■■ Ninth, the prosecutor stated that Dr. Mantell was "paid $2500 a day. He was here for two hours. That's about $1200 an hour." Defendant objected,

---

[28] On cross-examination, Dr. Klein agreed that being diagnosed with a life-threatening illness is a "very serious, stressful incident." The prosecutor then asked Klein, "Does that mean that person [who was diagnosed with a life-threatening illness] is going to go out at an anniversary of that date and . . . commit robberies?" Klein answered, "Not necessarily, no, sir."

"there's no testimony that's what he's paid per hour." The court sustained the objection. The prosecutor then stated, "$2500 per day, $250 per hour to review documents outside of court. You do the math. [¶] $2500 a day. I saw him here two hours that day, you do the math." Defendant claims these comments denigrated the witness. He did not object on this basis to the first comments, and did not object at all to the second comments. Therefore, he has forfeited this claim. In addition, defendant does not explain how these comments denigrated the witness. Finally, it is not inappropriate for the prosecutor to comment upon an expert witness's fee. (See *People v. Arias* (1996) 13 Cal.4th 92, 162 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

Tenth, the prosecutor stated, "[l]ife without parole—as you heard, in prison, he gets to write letters, gets to watch TV." Defendant objected, "there's been no testimony to that," and the court sustained the objection. Defendant offers no basis for concluding that the court's sustaining of the objection to the prosecutor's comment did not cure any error. In addition, because defendant did not request that the jury be admonished, he has forfeited his challenge.

Eleventh, the prosecutor stated, "[h]is choices put him here to where the community is now going to judge him and his actions. [¶] Our society must not be willing to overlook these types of aggravated—" Defendant objected "to the language." The court sustained the objection, stating: "I think one of the instructions you're going to get is you cannot consider public feeling or public opinion in making your judgment. And I am concerned that that last comment might be construed that way." In addition, the jurors subsequently were instructed that they must not be "swayed by public opinion or public feeling." Thus, any impropriety in the prosecutor's conduct was cured by the trial court's admonition and instructions. (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1315 [82 Cal.Rptr.3d 265, 190 P.3d 616] [any impropriety in the prosecutor's reference to the electorate "was cured by the court's admonition to disregard the comment and to follow the sentencing instructions"].)

Finally, the prosecutor referred to Officer Jansing as "the little park officer ranger who was there and didn't like the way the sticker was put on the car." Defendant asserts this statement appealed to the passions of the jury and vouched for the witness. Defendant did not object to this statement, and therefore he has forfeited his challenge. In addition, he provides no explanation of his contention, and we perceive no misconduct in the prosecutor's statement.

#### c. *Futility of objections*

As noted above, "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.]" (*Hill, supra,* 17 Cal.4th at p. 820.)

As reflected in our review of defendant's contentions, the trial court sustained most of the objections interposed by the defense to the challenged questions and statements, and overruled only three of these objections. In addition, the court admonished the jury on several occasions, in only one instance rejecting a request for an admonition. Thus, we find no support for the assertion that it would have been futile to interpose objections to the remaining instances of alleged prosecutorial misconduct or to request that the jury be admonished.

### 3. *Rejection of various instructions requested by defendant*

Defendant assigns as error the trial court's rejection of three jury instructions proposed by the defense. First, he contends the jury should have been instructed that the special circumstances of burglary-murder and robbery-murder should not be "double-counted" as factors in aggravation, because they arose from a single incident. As he acknowledges, we rejected this contention in *People v. Pollock* (2004) 32 Cal.4th 1153, 1195–1196 [13 Cal.Rptr.3d 34, 89 P.3d 353]. As in *Pollock,* the jury in the present case was instructed that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them." He presents no reason to depart from our conclusion that "[t]here is no reasonable likelihood that a jury so instructed would be unduly influenced by the mere number of special circumstances, without regard to the character or quality of the conduct on which they were based. Accordingly, defendant's claim is lacking in merit." (*Id.* at p. 1196.)

Second, defendant contends the jury should have been instructed that "[a] single mitigating factor is sufficient to support a decision that death is not the appropriate punishment." Instead, the court instructed that "[a]ny of the mitigating factors, standing alone, may support a decision that death is not the appropriate punishment in this case. [¶] A single mitigating factor, which you determine to be of sufficient weight, in relation to the aggravating factors, can support a decision that death is not the appropriate punishment." He asserts that the court's instruction "precluded the jury from being able to give whatever effect it wanted to the mitigating factor," and that "it is likely that one or more jurors did not realize that a single mitigating factor could outweigh all the aggravating evidence."

We rejected a substantially similar contention in *People v. Lenart* (2004) 32 Cal.4th 1107 [12 Cal.Rptr.3d 592, 88 P.3d 498], noting that "[t]he [proposed] instruction is argumentative because it states that any mitigating evidence may support a sentence of life without possibility of parole, but it does not state that any aggravating evidence may support a death sentence." (*Id.* at p. 1134.) In addition, as in *Lenart*, "because the jury was instructed with CALJIC No. 8.88 that it was not merely to balance the number of aggravating circumstances against the number of mitigating circumstances, and advised that it was to choose what weight to assign to any factor, it received an evenhanded framed instruction that addressed defendant's concern." (*Id.* at 1134–1135.)

■■■ Third, defendant contends the trial court erred in declining to instruct that "[a]n unintentional or accidental killing, even though criminal, may be considered to be a mitigating factor in the penalty phase of the case. An intentional killing may be considered to be an aggravating factor in the penalty phase of the case." In support of this claim, he cites *Tennard v. Dretke* (2004) 542 U.S. 274 [159 L.Ed.2d 384, 124 S.Ct. 2562], in which the jury was instructed to resolve two issues in deciding the appropriate punishment— whether the defendant's criminal conduct was deliberate, and whether there was a probability that the defendant would present a continuing threat to society. In light of the narrow issues presented in that case, the prosecutor argued that the defendant's low IQ was not relevant to the jury's penalty deliberations. The high court rejected the lower courts' narrow view of the relevant issues and evidence, reiterating that " ' "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." ' [Citation.] Thus, a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.' [Citation.]" (*Tennard v. Dretke, supra*, 542 U.S. at pp. 284–285.) Based upon this authority, defendant asserts "a jury could well have considered that the fact the killing was accidental had some mitigating value, but it was precluded from considering this evidence because of the trial court's refusal to instruct."

The trial court's instructions did not preclude the jury from considering evidence relating to the circumstances of the homicide. The court's instructions stated that "[i]n the guilt phase of the trial, you were instructed that, in the context of the felony murder rule, if a killing occurred in the course of a statutory felony, it did not matter whether the killing was intentional, unintentional or accidental, it still constituted first degree murder. [¶] For the penalty phase under Factor 'A' *how the killing occurred may be considered for the purpose of determining whether the circumstances of the crime constitutes an aggravating or mitigating factor*. [¶] Your assessment as to the nature of the act that resulted in the killing of [Timothy McVeigh] may be

considered, along with all the other circumstances attending your determination of first degree murder and the finding the special circumstances are true." (Italics added.) Thus, the instructions expressly informed the jury that although it could not consider at the guilt phase whether the killing was intentional or accidental, it could consider at the penalty phase "how the killing occurred" and "the circumstances of the crime" in weighing the appropriate penalty. This instruction clearly encompassed the substance of defendant's proposed instruction. In addition, the trial court's instruction properly conveyed that the circumstances of the homicide could be considered as aggravating or mitigating. In contrast, defendant's proposed instruction was argumentative in stating only that the circumstances could be considered as mitigating evidence, without noting that they also could be considered as aggravating evidence.

### 4. *Cumulative error*

Defendant contends the claimed errors, considered together, "resulted in convictions which are constitutionally unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the federal constitution." We have found no error at the penalty phase, and thus there is no error to consider cumulatively.

### D. *General Challenges to California's Death Penalty Scheme*

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme, based upon the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. As defendant acknowledges, we have considered and rejected these contentions in prior cases. Defendant presents no persuasive reason in the present case to reconsider the conclusions we previously reached.

California's death penalty statute adequately narrows the class of murderers eligible for the death penalty. (*Dykes, supra,* 46 Cal.4th at pp. 813, 820; *People v. Gurule* (2002) 28 Cal.4th 557, 663 [123 Cal.Rptr.2d 345, 51 P.3d 224] [a special circumstance based upon felony murder adequately narrows the class of persons eligible for the death penalty]; *People v. Ochoa* (2001) 26 Cal.4th 398, 458–459 [110 Cal.Rptr.2d 324, 28 P.3d 78] [the special circumstance of murder in the commission of an attempted robbery adequately narrows the class of persons eligible for the death penalty].) "In particular, the felony-murder special circumstance is not overbroad despite the number of different possible predicate felonies and the lack of a requirement that the killer have had the intent to kill." (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

The trial court need not distinguish between aggravating and mitigating factors. (*People v. Prieto* (2003) 30 Cal.4th 226, 271–272 [133 Cal.Rptr.2d 18,

66 P.3d 1123].) In addition, the penalty phase jury is not required to make unanimous findings concerning the particular aggravating circumstances, to find all aggravating factors beyond a reasonable doubt, or to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. (*Dykes, supra,* 46 Cal.4th at p. 813.) "Because ' "[u]nlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification" ' [citation], it is sufficient that the jury was instructed that ' "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole" ' [citation]. Moreover, '[t]he United States Supreme Court decisions rendered in *Ring v. Arizona* [(2002)] 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* [(2000)] 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] do not compel a different conclusion.' [Citations.]" (*Dykes, supra,* 46 Cal.4th at p. 814.)

" 'It is settled . . . that California's death penalty law is not unconstitutional in failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the comparative weight of aggravating and mitigating circumstances, or the appropriateness of a sentence of death. [Citations.]' [Citation.] We also have rejected the contention that the jury must be instructed that no party bears the burden of proof on the matter of punishment. [Citation.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1319 [96 Cal.Rptr.3d 512, 210 P.3d 1119] (*Lewis*).) In addition, the jury need not make written findings. (*Dykes, supra,* 46 Cal.4th at p. 813; *People v. Valencia* (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351].)

" 'This court's refusal to conduct intercase proportionality review of a death sentence does not violate the federal Constitution. [Citation.]' [Citation.]" (*Lewis, supra,* 46 Cal.4th at p. 1320; see also *Dykes, supra,* 46 Cal.4th at p. 819.)

"Section 190.3, factor (a), which allows the jury to consider '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1,' does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Stevens* [(2007)] 41 Cal.4th [182,] 211 [59 Cal.Rptr.3d 196, 158 P.3d 763].)" (*People v. Loker* (2008) 44 Cal.4th 691, 755 [80 Cal.Rptr.3d 630, 188 P.3d 580].) "As the United States Supreme Court noted in upholding factor (a) against an Eighth

Amendment challenge, 'our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. [Citation.]' [Citation.]" (*People v. Page* (2008) 44 Cal.4th 1, 60 [79 Cal.Rptr.3d 4, 186 P.3d 395].) Nor does the use of the term "extreme" in section 190.3, factor (d) " 'act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution.' [Citation.]" (*People v. Martinez* (2009) 47 Cal.4th 399, 455 [97 Cal.Rptr.3d 732, 213 P.3d 77] (*Martinez*).)

California's death penalty law "is not constitutionally defective because the prosecutor retains discretion whether or not to seek the death penalty. [Citations.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 932 [28 Cal.Rptr.3d 647, 111 P.3d 921].) "Furthermore, because 'capital defendants are not similarly situated to noncapital defendants, the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants. [Citations.]' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 199 [97 Cal.Rptr.3d 117, 211 P.3d 617].) Nor does California's death penalty scheme violate international law. (*Martinez, supra*, 47 Cal.4th at p. 456.)

Defendant, incorporating Justice Blackmun's opinion dissenting from the denial of certiorari in *Callins v. Collins* (1994) 510 U.S. 1141, 1143 [127 L.Ed.2d 435, 114 S.Ct. 1127], and his concurring opinion in *Sawyer v. Whitley* (1992) 505 U.S. 333, 357–360 [120 L.Ed.2d 269, 112 S.Ct. 2514], contends that the increasing barriers to granting habeas corpus relief "operate to render the system of review of capital convictions and sentences more arbitrary and less reliable than was contemplated when capital punishment resumed in 1976 [citation], and more arbitrary and less reliable than is required for there to be meaningful post-conviction review." We have observed, however: "Defendant's generalized complaints about the difficulty of obtaining relief on habeas corpus are premature in this direct appellate proceeding and, to the extent they concern the federal courts, are directed to the wrong tribunal as well." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 44 [45 Cal.Rptr.3d 407, 137 P.3d 229] (*Demetrulias*).)

Citing Judge Noonan's dissenting opinion in *Jeffers v. Lewis* (9th Cir. 1994) 38 F.3d 411, 425–427, defendant contends: "The circumstances of California's administration of the death penalty, especially as they exist at this time, are strikingly similar to those in Arizona [where only one of 103 persons who were sentenced to death during a 15-year period was executed during that period], and the ultimate selection of who lives and who dies is arbitrary, for those reasons." "In *People v. Snow* [(2003) 30 Cal.4th 43 [132 Cal.Rptr.2d 271, 65 P.3d 749]], we rejected a similar contention, based on the same dissenting opinion, that California's pace of execution, slow in comparison to

the number of death judgments, makes our system arbitrary. We explained: 'The federal appellate court has rejected this argument (*Woratzeck v. Stewart* (9th Cir. 1997) 118 F.3d 648, 652); we do so as well. "If Woratzeck's death sentence does not violate the Eighth Amendment, then neither does the scheduling of his execution. Arizona must establish some order of execution. There has been no prima facie showing that this scheduling violates the Eighth Amendment." (*Ibid.*) The same is true here. Defendant does not face imminent execution and can hardly claim he is being singled out for either quick or slow treatment of his appeal and habeas corpus proceedings. More generally, defendant makes no showing that the number of condemned prisoners executed in California, or the order in which their execution dates are set, is determined by any invidious means or method, with discriminatory motive or effect, or indeed according to anything other than the pace at which various defendants' appeals and habeas corpus proceedings are concluded, a matter by no means within the sole control of the state.' (*People v. Snow, supra,* 30 Cal.4th at p. 127.)" (*Demetrulias, supra,* 39 Cal.4th at pp. 44–45.)

## III. CONCLUSION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.